[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 22, 2002
THOMAS K. KAHN
CLERK

No. 00-10108

D. C. Docket No. 99-00003 CR-WPD

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTONIO ALLEN,
a.k.a. Tony Wright, a.k.a. T. Wright,
COREY SMITH,
a.k.a. Bubba,
ANTONIO GODFREY,
a.k.a. Garhead,
KETTRICK MAJOR,
ERIC STOKES,
a.k.a. Eric Stewart, a.k.a. Eric Strokes,
LATRAVIS GALLASHAW,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Florida

**(August 22, 2002)**

Before BIRCH and WILSON, Circuit Judges, and DOWD[*], District Judge.

DOWD, District Judge:

This appeal challenges both the jury convictions and sentences imposed on the six appellants, Corey Smith, Antonio Allen, Latravis Gallashaw, Eric Stokes, Antonio Godfrey, and Kettrick Major (collectively, the "Defendants" or the "Appellants"). Four of the Appellants, Smith, Gallashaw, Godfrey, and Stokes, were sentenced to life terms. Allen received a sentence of 420 months, and Major a sentence of 240 months. The jury conviction followed a trial that spanned twenty-one days over a period of approximately seven weeks.

## I. BACKGROUND

The United States ("Government") alleged twenty counts against fifteen defendants in the superseding indictment. After several plea agreements were struck, only twelve counts and six defendants remained. Count 1 charged the Defendants of conspiracy to distribute cocaine and marijuana in violation of 21 U.S.C. § 846. Counts 3, 13, and 19 charged Smith and Stokes of knowingly possessing a firearm in violation of 18 U.S.C. § 922(g)(1). Count 4 charged Allen and Gallashaw of possession with intent to distribute cocaine in violation of 21

---

[*] Honorable David D. Dowd, Jr., U.S. District Judge for the Northern District of Ohio, sitting by designation.

U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Counts 5 and 20 charged Allen and Smith, respectively, of using and carrying a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)-(c)(2). Counts 6 and 9 charged only Gallashaw and Count 10 charged both Smith and Gallashaw of possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count 11 charged Smith and Gallashaw of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count 12 charged Smith with knowingly possessing two unregistered hand grenades in violation of 26 U.S.C. §§ 5861(d) and 5871.

At the close of the Government's case-in-chief, the district court granted motions for acquittal on Counts 6, 9, and 12 pursuant to Rule 29[1]. After the Government voluntarily dismissed Count 20, only eight counts remained for the jury to decide as to the Defendants.

When the jury completed its deliberations, the verdicts were as follows: Smith was convicted of Counts 1, 3, 10, and 11, and acquitted of Count 13. Gallashaw was convicted of Counts 1, 4, 10, and 11. Allen was convicted of Counts 1, 4, and 5. Stokes was convicted of Counts 1 and 19. Godfrey and Major were both convicted of Count 1 only.

---

[1] Fed. R. Crim. P. 29.

3

## II.  EVIDENCE OF THE COUNT 1 CONSPIRACY

Jackson v. Virginia, 443 U.S. 307, 319 (1979), teaches that evidence is sufficient to support a criminal conviction if, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.  The Government alleged only one conspiracy, set forth in Count 1 of the superseding indictment.  Construed in accordance with Jackson, the evidence presented at trial shows that the Appellants sold a plethora of narcotics and committed numerous acts of violence in furtherance of a massive drug conspiracy.

Beginning in the mid-1990s, a group of teenagers and young adults known as the "John Doe" gang trafficked drugs in Liberty City, an impoverished area of northwest Miami.  A spin-off of a defunct group called the "Lynch Mob," the John Does ran about a half-dozen "drug holes."  A "drug hole" referred to a street location where the John Doe dealers would peddle their illicit drugs.[2]  Although the gang started with no more than six or so members, membership grew to approximately fifty people at its peak.[3]

---

[2] (See, e.g., Trial Tr. vol. 17 at 194-95.)

[3] (Trial Tr. vol. 19 at 12.)

4

The John Does conducted their drug operations methodically, and were well organized with a hierarchy of members. From top to bottom, Defendant Corey Smith was the leader of the gang, and Defendant Latravis Gallashaw was second-in-command. Gallashaw supervised "lieutenants" in the organization, who were responsible for the daily operations of a drug hole. Part of the daily operations consisted of maintaining an inventory of drugs based on street demand, and accounting for money and leftover drugs at the end of a shift. Beneath each lieutenant were table men, bombmen or servers, lookouts or watchouts, and gunmen or enforcers. The duties of each of these underlings were as follows: table men packaged drugs, bombmen or servers sold drugs, lookouts or watchouts alerted gang members of police or unknown people or vehicles, and gunmen or enforcers protected the drug holes.[4]

To facilitate their operations, the organization maintained a variety of firearms. They used violence and threats of violence against rival drug dealers. Sometimes, higher-ranking members would even threaten or assault their own subordinates. Under a sophisticated system of role assignments and weaponry, the

---

[4] Several witnesses testified to this organizational structure and each Appellant's role, including unindicted John Doe members Eric Mitchell (Trial. Tr. vol. 17 at 205-06), Demetrius Jones (Trial Tr. vol. 19 at 11-12, 14-17), and indicted co-conspirators Jeffrey Bullard (Trial Tr. vol. 23 at 131-32) and Charles Clark (Trial Tr. vol. 28 at 120-24).

John Doe organization sold cocaine, cocaine base (also known as crack),[5] and marijuana continuously throughout the day and night from about 1994 until the Defendants' arrests in late 1998 and early 1999.

In terms of revenues, during the early stages of the organization's drug business, a hole would generate about $2500 in a day.[6] As the organization expanded its territory, the amount generated on a Friday night could reach $10,000.[7] At its peak, drug sales of cocaine alone reached five to seven kilograms per week at an estimated price of $16,000 per kilogram.[8] As a testament to the organization's drug trade savvy, one co-conspirator testified that sales typically increased during the first of the month. He also noted that the most he ever made was $23,000 in a single 12-hour shift.[9] Not surprisingly, when the Federal Bureau of Investigation ("FBI") put the John Doe gang out of business, it seized over $185,000 in cash from Smith's residence.[10]

---

[5] Inexplicably, the superseding indictment fails to mention crack anywhere in the substantive drug offenses (Counts 4, 10, 11).

[6] (Trial Tr. vol. 17 at 97.)

[7] (Trial Tr. vol. 28 at 132.)

[8] (Trial Tr. vol. 23 at 138.)

[9] (Trial Tr. vol. 28 at 131-32.)

[10] (Trial Tr. vol. 22 at 27.)

The FBI began its operations in September 1997. Obtaining court approval, the FBI intercepted numerous telephone communications[11] of various John Doe members[12]. Building their case piece by piece, agents developed significant evidence of the organization's production and sale of marijuana, cocaine, and crack. From time to time, agents raided the drug holes, arrested dealers, and seized substantial amounts of drugs, drug paraphernalia, and cash.[13]

At the conclusion of the FBI's operations, numerous arrests were made and charges filed. From its extensive investigation, the Government was able to determine the roles of each of the Defendants. Again, Smith was the leader, and Gallashaw stood next in command.[14] Stokes and Godfrey were lieutenants and

[11] The FBI implemented two wiretaps: one on Smith's telephone (Trial Tr. vol. 22 at 5-6, vol. 23 at 93-94) and the other on Gallashaw's (Trial Tr. vol. 22 at 12-13). FBI Special Agent Terry Beamer testified that more than 2000 communications were intercepted over the course of the investigation. (Trial Tr. vol. 22 at 11, 13.)

[12] Except for Stokes, each Defendant was identified as a participant in at least one wiretapped communication. (See, e.g., Trial Tr. vol. 22 at 20 (identifying Smith and Gallashaw on wiretaps 136 and 137), vol. 23 at 71-72 (identifying Godfrey on wiretap 4534), vol. 24 at 124 (identifying Allen on wiretap 1690), and vol. 24 at 125-26 (identifying Major on wiretap 37.) In addition, the voices of other indicted and unindicted people were identified. (See, e.g., Trial. Tr. vol. 22 at 28 (identifying Smith's sister, Todra Smith, on wiretap 1703), vol. 24 at 131 (identifying William Austin on wiretap 2233), and vol. 24 at 103 (identifying Jeffrey Bullard on wiretap 3415).)

[13] The FBI's devotion of resources to this investigation was extensive. In addition to the wiretaps, the agency drove a number of unmarked vehicles in the area and monitored incoming mail to a post office box. (Trial Tr. vol. 22 at 28, vol. 23 at 28.) In October 1998, the FBI began hitting the drug holes and seizing drug stashes. (Trial Tr. vol. 22 at 34.)

[14] Again, several witnesses testified as to each defendant's role in the organization. (See, e.g., Trial. Tr. vol. 17 at 205-06, vol. 19 at 11-12, 14-17.)

gunmen. Allen was a bombman. Major was a lieutenant and then a table man. Among the other individuals involved, but not parties to this appeal, were: Jeffrey Bullard, a table man; John Goodine, a server; Eric Mitchell, a lieutenant; and Charles Clark, a watchout who later became a server.[15] The trial testimony of these four individuals became a significant portion of the Government's case against the Defendants.

The investigation also revealed that the John Does were extremely capable and, oftentimes, ruthless in furthering their drug trade. To expand their criminal operations, the John Does muscled out rival drug dealers and took over their street locations. As the organization gained notoriety and their acts of violence escalated, they met with little resistance from other dealers in the neighborhood. On several occasions, however, the gang found it necessary to carry out its threats of violence and mayhem.

Leon Hadley was known in the neighborhood as a long-time drug dealer. Hadley had been dealing drugs since the Appellants were children. Hadley made the mistake of continuing to treat the Appellants as kids as they grew older. In 1995, Mark Roundtree, an affiliate of Smith, got into an argument with Hadley. The argument culminated into a shooting with Hadley suffering a bullet wound to

---

[15] (Trial Tr. vol. 23 at 131-32, vol. 28 at 120-24.)

his leg. Fearing retaliation, Roundtree and Smith got together with a third individual to finish off Hadley. Armed with a multitude of firearms, including assault rifles, these three individuals got into a car, drove to a location where Hadley frequented, and shot him multiple times. With Hadley apparently still struggling to hold onto life, Smith fired several more shots at him until he was dead. This murder gained Smith a reputation for being tough and precipitated the formation of the ruthless John Doe organization with Smith at its head.[16]

It was not long before the John Doe organization became a feared presence in the community. In 1996, Dominique Johnson was a rival drug dealer who engaged Smith in a heated argument over territory. After tempers had seemingly cooled off, Smith and Roshard Ward sought out Johnson, cursed him, and fired multiple shots, killing him. Two people witnessed this murder, including Cynthia Brown. Brown stepped forward, and identified Smith and Ward to police as the shooters. Demetrius Jones, another John Doe member, also witnessed the murder, but did not go to police. With Brown's eyewitness account, the state arrested Smith and charged him with the murder of Johnson.[17]

---

[16] (Trial Tr. vol. 21 at 9-17, vol. 23 at 126-28 (describing murder of Hadley and the effect on Smith's reputation).)

[17] (Trial Tr. vol. 19 at 42-48, vol. 21 at 17-18, 22-23, vol. 29 at 146-52 (testimony describing circumstances of Johnson's murder).)

With his trial date approaching, Peggy King, a long-time associate of Smith, asked Jones to say he saw the shooting and that someone other than Smith committed the crime. Jones agreed, but with the eyewitness testimony of Brown, Smith's then-attorney advised, the Jones' alibi would matter little. Smith hatched a plan to kill Brown, which came to fruition on the eve of his murder trial. On July 23, 1997, Brown was found dead in a hotel room. Without a witness to testify about the Johnson murder, the state dropped the charges against Smith.[18]

Having committed murder, the John Does were becoming increasingly bold and ruthless. James Jackson purchased a gun from Octavius Williams, nicknamed Bean, and Lamar Newsome, nicknamed Bally. Jackson used the gun to rob Peggy King. Upon realizing Peggy King's connection to the gang, Jackson returned the stolen goods and apologized to Smith for failing to recognize her affiliation. Dissatisfied, Smith sent Gallashaw to confront Jackson about the robbery. Gallashaw met with Jackson, argued about the robbery for a short time, and then shot him five times. Jackson survived, but Smith was not done "handling" the robbery incident. Knowing that Williams and Newsome had supplied Jackson with the firearm to rob Peggy King, Smith viewed them as a threat to the organization's

---

[18] (Trial Tr. vol. 21 at 24-25 (recounting King's request to lie about the Johnson murder); Trial Tr. Trial Tr. vol. 21 at 37-38 (describing meeting with Smith's attorney); Trial Tr. vol. 21 at 38, 40 (reciting Smith's statements about "taking care of" Brown).)

power.  So, Smith ordered them killed.  Julius Stevens and Jean Henry carried out the order, riddling the vehicle in which Williams and Newsome occupied with bullets fired from high-powered assault rifles.  They were both struck multiple times and killed instantly.[19]

Melvin Lipscomb was a repeat customer of John Doe dealers.  While at one of the drug holes, Lipscomb began complaining about the quality of drugs that he purchased.  Allen responded by telling him to shut up and to leave immediately.  Lipscomb did not heed the warning and continued to complain.  So, Godfrey walked up to Lipscomb and, without warning, shot him several times.  Injured, Lipscomb fled, but Godfrey caught up to him and shot him dead.[20]

Smith and the John Does knew no loyalty when it came to their drug trade.  Calvin Cook was one of Smith's best friends growing up.  Now older, Smith supplied Cook with drugs to sell, but Cook refused to hand over any of the proceeds.  Smith sensed that Cook was taking advantage of their childhood friendship, and put a contract out for his murder.  Xavier Roberts, a younger John Doe member, agreed to kill Cook.  In 1996, possessing an arsenal of weapons,

---

[19] (Trial Tr. vol. 24 at 53-56, 62-66 (describing circumstances surrounding the murders of Bean and Bally).)

[20] (Trial Tr. vol. 23 at 155-56, vol. 24 at 4-10 (describing circumstances of Lipscomb's murder).)

including the military style AK-47 assault rifle, Roberts, Jones, and Nathaniel Urser set out to shoot and kill Cook. They found Cook outside of his house and fired multiple shots at him in a drive-by shooting. Seeing Cook injured but still alive, Jones exited the vehicle and shot Cook several times, killing him.[21]

Marlon Benneby was a server who sold his own drugs in addition to those he obtained from the gang. Eventually, the organization discovered Benneby's side dealings and sought to put an end to it. Godfrey and Gallashaw set out to discipline Benneby by beating him. When they found Benneby, Gallashaw tried to pistol whip him, but the gun discharged and Benneby was shot in the face. He later died while in the hospital.[22]

Like Benneby, Anthony Fail was a disloyal member of the organization. Disguising himself and using a gun, Fail robbed the hole for which he was the assigned lieutenant. The gang soon discovered Fail's charade, which sent him running from the gang. Fail and various members of the gang waged war against each other, exchanging gunfire upon their every encounter. On one occasion, John Doe members saw what they thought was the vehicle owned by Fail with someone

---

[21] (Trial Tr. vol. 19 at 25-35, vol. 29 at 127-35 (describing circumstances of Cook murder).)

[22] (Trial Tr. vol. 24 at 68-72, vol. 29 at 164-69 (describing circumstances of Benneby killing).)

in it.  The members fired numerous times at the vehicle, killing its occupant instantly.  Only, Fail was not inside the vehicle; his girlfriend, Angel Wilson, suffered the fate intended for Fail.[23]

The evidence of the Count 1 conspiracy is overwhelming.  Without a doubt, the evidence uncovered a massive drug conspiracy whose members simply beat or killed anyone who got in their way.  The sufficiency of the evidence, however, does not resolve the multitude of sentencing issues that arose at trial.  See infra Part IV.

## III.  EVIDENCE OF THE SUBSTANTIVE DRUG OFFENSES

Smith, Allen, and Gallashaw were not only charged with the drug conspiracy of Count 1, but were also charged with substantive offenses of drug possession with intent to distribute.  Count 4 charged Allen and Gallashaw with possession of an unspecified amount of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1).  This substantive drug charge was the result of the seizure of cocaine at Allen's residence at 1520 Northwest 61st Street on September 10, 1998.  Counts 10 and 11 charged Smith and Gallashaw with possession of unspecified amounts of cocaine and marijuana with intent to distribute in violation of the same statute.  The Government alleged these counts as a result of  the seizure on October 24,

---

[23]  (Trial Tr. vol. 24 at 86, 87-95, 97-100 (describing circumstances of Wilson murder).)

1998, of both substances at Gallashaw's residence, located at 7705 Northwest 10th Avenue.

To prove Count 4, the Government called law enforcement officers to testify about the seizure and identification of drugs at Allen's residence. Detective Robert Couseillant of the Miami Police Department testified that he participated in the search of this location. On September 10, 1998, at about 5 o'clock in the afternoon, Couseillant and about seven or eight other police officers arrived at the target location and knocked on the door. Allen answered the door, holding a bag containing a suspicious substance, and then ran back into the apartment upon discovering who was at the door. Officers apprehended Allen and conducted a search of the premises. The search resulted in the seizure of numerous suspicious substances in varying quantities.[24] Bolstering the evidence against Allen, Couseillant testified that Allen admitted responsibility to him for the substances recovered from the residence.[25] Lab tests revealed the substances to be cocaine.

Also indicting Gallashaw on Count 4, the Government presented significant evidence to show that he, at the very least, aided and abetted in the substantive drug violation. Bullard confirmed that Allen's duty was to report any drugs seized

---

[24] (Trial Tr. vol. 24 at 14-18, 25-26, 31-35, 44 (Couseillant's testimony regarding the search and seizure of Allen's residence).)

[25] (Trial Tr. vol. 20 at 62, 64, 67.)

14

by the police to Gallashaw through Riggins.[26] Consistent with Bullard's testimony, the Government introduced wiretap evidence of a phone conversation between Gallashaw and Harrison Riggins, an unindicted co-conspirator, in which Gallashaw inquires as to what the police seized from Allen's residence.[27] In another wiretap, Allen asks Gallashaw for money for an attorney, and Gallashaw agrees to pay.[28]

To prove Counts 10 and 11, the Government took the same approach as it did to prove Count 4. The Government called law enforcement officers to testify about the seizure and identification of drugs at Gallashaw's residence. Special Agent David McCranie of the Federal Bureau of Investigation testified that he participated in executing a search warrant at Gallashaw's address on October 24, 1998. McCranie, and approximately ten to fifteen other officers, including a SWAT team from the Miami police department, gained entry to the residence and seized a number of suspicious substances.[29] Lab tests confirmed that the substances were cocaine and marijuana.

---

[26] (Trial Tr. vol. 24 at 124.)

[27] (Trial Tr. vol. 122 (wiretap 840).)

[28] (Trial Tr. vol. 24 at 124 (wiretap 1960).)

[29] (Trial Tr. vol. 27 at 195, 199-200, 223-24, 228-31, 233-34 (testimony describing the search and seizure of various items from Gallashaw's residence).)

Bullard, a Government witness, testified that he was packaging cocaine at Gallashaw's residence when McCranie and other law enforcement officers raided the place and arrested him. He also testified that both cocaine and marijuana were present in Gallashaw's residence at the time of the raid. When shown pictures at trial of the substances that were seized, Bullard identified them as packaged cocaine.[30]

Also indicting Smith on Counts 10 and 11, the Government presented significant evidence to show that he, at the very least, aided and abetted in these substantive drug violations. Importantly, as shown by the testimony of several individuals, Gallashaw reported to Smith in the organization's hierarchy. The Government intercepted a telephone call from Gallashaw to Smith in which Gallashaw informs Smith about the raid. Smith asks Gallashaw, "What they got, dope out of there?"[31]

## IV. SENTENCING ISSUES

### A. *Introduction*

The initial indictment was filed on January 5, 1999. The jury trial began on September 7, 1999, and concluded with the guilty verdicts against all six

---

[30] (Trial Tr. vol. 24 at 36-42 (Bullard's testimony about the raid at Gallashaw's residence).)

[31] (Trial Tr. vol. 28 at 59 (wiretap 4473).)

defendants on October 21, 1999.  The sentencing hearings began on December 30, 1999, and concluded on January 7, 2000.

Sentencing issues abound in this case.  The decision in Apprendi v. New Jersey, 530 U.S. 466 (2000), had not yet been filed, but, as acknowledged by the district court during the sentencing hearings, the pivotal decisions in United States v. Dale, 178 F.3d 429 (6th Cir. 1999), and United States v. Rhynes, 196 F.3d 307 (4th Cir. 1999), had been issued.  The Dale-Rhynes decisions addressed the sentencing problem that arises where the government alleges a conspiracy of multiple controlled substances (in this case, cocaine and marijuana), there is no special verdict as to either substance, and the maximum sentences for an unspecified amount of each substance differ.[32]

The drug conspiracy alleged in Count 1 described two controlled substances as objects of the conspiracy: cocaine and marijuana.  All six defendants were found guilty of this count.  The Government concedes that the jury's verdict as to Count 1 is a general verdict, not a special verdict, and that Count 1 did not allege a quantity of either cocaine or marijuana.[33]

---

[32]  21 U.S.C. § 841(b)(1)(C)-(D) provides for a maximum sentence of five years for an unspecified amount of marijuana and a maximum sentence of twenty years for an unspecified amount of cocaine, absent enhancements for prior drug felony convictions.

[33]  Count 1 of the superseding indictment charging the six appellants with conspiracy alleged, in relevant part:

Major and Godfrey were convicted of Count 1 only. Major was sentenced to a term of 240 months and Godfrey to life imprisonment. Stokes was convicted of Count 1 and Count 19, but of no substantive drug offense. Stokes was sentenced to life in prison. Smith and Gallashaw were convicted of the substantive drug offenses set forth in Counts 10 (marijuana) and 11 (cocaine). Allen and Gallashaw were convicted of the substantive drug offenses set forth in Count 4 (cocaine). Smith and Gallashaw were sentenced to life in prison. Allen was sentenced to 420 months.[34]

As with the conspiracy count, Counts 4, 10, and 11 did not allege any specific quantity of the controlled substance and the jury was not asked to make such a finding.[35]

---

> From at least as early as July 1994, the exact date being unknown to the Grand Jury, and continuing thereafter until or about January 5, 1999, in Miami, Miami-Dade County in the Southern District of Florida, and elsewhere the defendants... did knowingly and intentionally combine, conspire, confederate and agree with each other, and with persons known and unknown to the Grand Jury, to possess with intent to distribute a Schedule II controlled substance and a Schedule I controlled substance, that is, mixtures and substances containing detectable amounts of cocaine and marijuana; in violation of Title 21, United States Code, Section 841.

(Superseding Indictment at 2-3.)

[34] With respect to the sentences of Allen, Major, and Godfrey, the Government filed enhancement notices for each of these defendants (Doc. Nos. 430, 431, 432) on September 3, 1999, four days before the trial began.

[35] Count 4 of the superseding indictment alleged:

We shall first address the Dale-Rhynes issue because all six defendants are affected by the analysis.

## B. *The Dale-Rhynes Issue*

On or about September 10, 1998, at Miami, Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants, Antonio Allen, a/k/a "Tony Wright," a/k/a "T. Wright," and Latravis Gallashaw, a/k/a "Trav," did knowingly and intentionally possess with intent to distribute a Schedule II controlled substance, that is, a mixture and substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

(Superseding Indictment at 12 (emphasis added).)

Count 10 of the superseding indictment alleged:

On or about October 24, 1998, at Miami, Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants, Corey Smith, a/k/a "Bubba," Jeffrey Bullard, a/k/a "Jeffrey Tookes," a/k/a "Tank," Daniel Dunston, a/k/a "Danny Boy," a/k/a "D.B." and Latravis Gallashaw, a/k/a "Trav," did knowingly and intentionally possess with intent to distribute a Schedule I controlled substance, that is, a mixture and substance containing a detectable amount of marijuana; in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

(Superseding Indictment at 14-15 (emphasis added).)

Count 11 of the superseding indictment alleged:

On or about October 24, 1998, at Miami, Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants, Corey Smith, a/k/a "Bubba," Jeffrey Bullard, a/k/a "Jeffrey Tookes," a/k/a "Tank," Daniel Dunston, a/k/a "Danny Boy," a/k/a "D.B." and Latravis Gallashaw, a/k/a "Trav," did knowingly and intentionally possess with intent to distribute a Schedule II controlled substance, that is, a mixture and substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

(Superseding Indictment at 15 (emphasis added).)

19

The district court was aware of the decision of the Sixth Circuit in United States v. Dale, 178 F.3d 429 (6th Cir. 1999), when it engaged in the multiple sentencings in this case.[36] The facts in Dale bear some similarity to the facts in this case. Dale was convicted of conspiracy to distribute both crack and marijuana based on a single count charging the conspiracy. Evidence was presented that supported the distribution of both drugs. The Dale court found that the conspiracy count charging more than a single type of a controlled substance, i.e. marijuana and crack, was not duplicitous; rather, the defendant's sentence that was based on a quantity of crack was improper, based on a general verdict, where the sentence exceeded the maximum sentence for conspiracy to distribute marijuana.[37] The

[36] (Trial Tr. vol. 40 at 6 (Godfrey); Trial Tr. vol. 41 at 3 (Major); and Trial Tr. vol. 43 at 5 (Gallashaw).)

[37] In Dale, the district court gave a specific unanimity charge as to two controlled substances, marijuana and crack, but gave the jury only a general verdict. Applying Griffin v. United States, 502 U.S. 46, 56-57 (1991), the conviction was not disturbed, except on the basis of the sentence. The Dale court then opined:

> Seven of the eight circuits that have directly considered this issue have decided that the punishment imposed cannot exceed the shortest maximum penalty authorized in the statutes criminalizing the multiple objects if the punishment authorized by the conspiracy statute depends on the punishment provided for the substantive offenses which were the objects of the conspiracy. That is the case here. The maximum sentence for conspiring to distribute a controlled substance depends on the controlled substance to be distributed. 21 U.S.C. § 846. Given the facts in this case, the maximum sentence for a conspiracy to distribute marijuana is five years, 21 U.S.C. § 841(b)(1)(D), while a conspiracy to distribute crack would yield a forty-year maximum sentence, 21 U.S.C. § 841(b)(1)(B).

> Five courts of appeals have held that when the jury returns a general

20

Dale court followed the teachings of United States v. Orozca-Prada, 732 F.2d 1076, 1083-1084 (2nd Cir. 1984), which held that, while special verdicts were generally not favored in criminal cases, they were appropriate when the information sought is relevant to the sentence to be imposed. Id. at 1084.

The 1984 decision in Orozca-Prada took on more importance when it was cited by the Supreme Court in Edwards v. United States, 523 U. S. 511 (1998), in a pre-Apprendi holding. In Edwards, the defendant was indicted for conspiring "to possess with intent to distribute... mixtures containing" two controlled substances, namely "cocaine... and cocaine base [i.e., crack]." The district court instructed the jury that "the government must prove that the conspiracy... involved measurable amounts of cocaine or cocaine base." The jury returned a general verdict of guilty. Against that background the district court imposed a sentence that did not exceed the maximum if the defendant had been convicted of a conspiracy limited to cocaine only. The Supreme Court affirmed the Seventh Circuit's upholding of the sentence. In doing so, however, Justice Breyer, writing for a unanimous court, opined:

> verdict to a charge that a conspiratorial agreement covered multiple drugs, the defendant must be sentenced as if he distributed only the drug carrying the lower penalty.

Dale, 178 F.3d at 432 (footnote omitted).

21

> Of course, petitioners' statutory and constitutional claims would make a difference if it were possible to argue, say, that the sentences imposed exceeded the maximum that the statutes permit for a cocaine-only conspiracy. That is because a maximum sentence set by statute trumps a higher sentence set forth in the Guidelines. But, as the Government points out, the sentences imposed here were within the statutory limits applicable to a cocaine-only conspiracy, given the quantities of that drug attributed to each petitioner.

Edwards v. United States, 523 U. S. 511, 515 (1998) (relying in part on Orozca-Prada, 732 F. 2d at 1083-1084, for the proposition that a court may not sentence a defendant under statutory penalties for a cocaine conspiracy where the jury may have found only a marijuana conspiracy).

In the case at bar, the district court expressed some concern about the sentencing procedures as to Count 1, and mentioned both Dale and United States v. Rhynes, 196 F.3d 207 (4th Cir. 1999), vacated in part en banc, 218 F.3d 310 (4th Cir. 2000).[38] In Rhynes, the defendants were charged with conspiracy to possess with intent to distribute cocaine, crack, heroin and marijuana. The district court submitted a general verdict as to the conspiracy count and used the conjunction "or" to indicate to the jury that it could find a defendant guilty of the conspiracy count if it found that the defendant had conspired to distribute or possess with intent to distribute heroin, or cocaine, or crack, or marijuana. In that case, neither the defendants nor the government requested a special verdict as to the object of

---

[38] (Trial Tr. vol. 43 at 5.)

the conspiracy. The <u>Rhynes</u> court followed <u>Dale</u> and concluded, in the absence of a special verdict, that it could not sentence beyond the maximum sentence for the least serious of the four alleged controlled substances, i.e., marijuana. <u>Rhynes</u>, 196 F.3d at 239.

We turn now to examine the Government's claim that there was no sentencing error with respect to the sentences arising from the Count 1 conspiracy conviction. We begin with the jury instructions. The district court provided a copy of the jury instructions to the jury as well as a copy of the superseding indictment (Doc. No. 508). Jury instruction No. 11 contains the court's instruction on Count 1. Reading from the first three paragraphs of the superseding indictment, the district court stated:

> In this case, as you know, the Indictment charges eight separate offenses called "counts." I will not read it to you at length because you will be begin [sic] a copy of the Indictment for study during your deliberations.

> In summary, <u>count one</u> charges that the defendants knowingly and willfully conspired together to possess cocaine with the intent to distribute it, in violation of the law.

> Title 21, United States Code, Section 846 makes it a separate federal crime or offense for anyone to conspire or agree with someone else to do something which, if actually carried out, would be a violation of Section 841(a)(1). <u>That section makes it a crime for anyone to knowingly possess cocaine or marijuana with the intent to distribute it</u>. So, under the law, a "conspiracy" is an agreement or a

23

kind of "partnership in criminal purposes" in which each member becomes the agent or partner of every other member.

(Trial Tr. vol. 36 at 201-02 (emphasis added).)

As the district judge read the second paragraph to the jury, he apparently became aware of the fact that the written instruction was incomplete and added a phrase at the end of the second paragraph which corrected the omission: "And I think it also includes marijuana." (Trial Tr. vol. 36 at 201-02.)

The third paragraph in Jury Instruction No. 11 refers to Section 841(a)(1) concerning the crime of knowingly possessing cocaine or marijuana and uses the conjunction "or." The district court's discussion during Gallashaw's sentencing hearing indicates persuasively that the printed jury instructions, which omitted a reference to marijuana as being a part of the charged conspiracy, were not revised prior to being handed to the jury.[39]

In discussing the Dale-Rhynes issue, the following colloquy ensued:

THE COURT: Since that time I have read another case now from the Fourth Circuit, United States versus Rhynes, R-h-y-n-e-s, at 196 F.3d 207. And the Fourth Circuit agrees with Dale that the shorter maximum sentence should be used if there is a general, rather than a specific verdict. And I have been giving more thought to the situation as to count one. It only applies to count one. But under the Dale and the Rhynes opinion, if you have a conspiracy to possess with

---

[39] The record, as transmitted, includes a copy of the printed jury instructions (Doc. No. 508) and bears the district court's signature with the declaration "submitted" and the date of "10/19/99."

24

intent to distribute cocaine or marijuana and you give the jury a general verdict, how can you tell that they didn't come back with guilty of conspiracy to possess with intent to distribute marijuana and not cocaine? And consequently the Dale and the Rhynes courts have said that you have to use the marijuana maximum, rather than the cocaine maximum.

I don't know that that's going to help Mr. Gallashaw any because, again, count 11 carries a maximum of life in prison. It's a possession with intent to distribute cocaine. And if the Court considers the relevant conduct for that one specific date to be more than 150 kilograms, it may not do Mr. Gallashaw any good.

But as to count one, if the Court were to find the Fourth Circuit and the Sixth Circuit opinions to be persuasive, then there is an argument that the maximum sentence that Mr. Gallashaw can get on count one is five years in prison.

I note that count one of the Indictment -- it's a long count, but on page 3 charges that everybody listed there did knowingly and intentionally combine, conspire, confederate and agree with each other and with persons known and unknown to the Grand Jury to possess with intent to distribute a schedule two controlled substance and a schedule one controlled substance, that is, mixtures and substances containing detectable amounts of cocaine and marijuana. It doesn't say, "or marijuana." It says, "and marijuana."

So I am wondering if that distinguishes the Rhynes and the Dale situation where the concern of the Court was that those defendants had been charged alternatively with cocaine or marijuana, whereas, it looks to me like this Indictment may charge conspiracy to possess with intent to distribute both cocaine and marijuana.

When you look at the jury instructions that were actually used, jury instruction number 11 is, I guess, the instruction we gave them on conspiracy, and it says in summary: <u>Count one charges that the defendants knowingly and willfully conspired together to possess cocaine with the intent to distribute it</u>.

25

<u>It doesn't even mention marijuana</u>.

MR. CHARLES WHITE: Your Honor, I believe that there are other statutes where the conjunction "and" is used, and the cases have been pretty clear that "and" means "or" for purposes of the determining the criminal liability.

THE COURT: Well, again, I think I am going to rule consistent with what my ruling was last week on this case and on the other cases, but I am troubled by the Rhynes and the Dale opinion. And last week I was saying that had someone asked me to give a special verdict I would have done that. And I know I had read Dale before we got to the conclusion of this case, and I am troubled that I didn't do it on my own to have avoided this circumstance. But I am confident based on the language of the Indictment, the instructions that we gave, and the testimony in the case that conviction on count one was for conspiracy to possess with intent to distribute cocaine, and that's the way I am going to rule, but I wouldn't be shocked if the Eleventh Circuit, looking at Rhynes and Dale, were to feel differently.

(Trial Tr. vol. 43 at 5-7 (emphasis added).)

Prior to final argument and the charging of the jury, each of the Defendants requested that the jury be given a verdict form to find whether the Defendants were guilty of conspiring to distribute cocaine or conspiring to distribute marijuana. The Government objected and the district court agreed that there was but one conspiracy: "cocaine, marijuana, period."[40]

---

[40] As to the issue of a special verdict for Count 1, the following exchange took place:

MR. CHARLES WHITE: Your Honor, as to the verdict form, I think -- I notice that in count one the defendants are charged with two separate conspiracies. One is a conspiracy to distribute cocaine and the other is a conspiracy to distribute marijuana. And I would request on behalf of Mr.

26

The Government contends on appeal that by using the conjunction "and" in Count 1 to connect the two controlled substances, it was required to prove that each Defendant agreed to be involved with <u>both</u> controlled substances. (Appellee's Br. at 76.) Proof of a Defendant's agreement as to only one of the controlled substances, be it cocaine or marijuana, would have required the jury to acquit as to Count 1. (Appellee's Br. at 76.) The Government's final argument at trial made no such assertion. Rather, at the beginning of its final argument, the Government made the following comments about the nature of the conspiracy:

> The case that you have learned about over the past six weeks or so is not a difficult case. It's not difficult at all. <u>It's a conspiracy to possess with intent to distribute narcotics.</u>

---

Gallashaw that there be on the verdict form an indication as to which one or both if the jury finds that the defendants were -- the defendants were guilty, whether they were guilty of conspiring to distribute cocaine or conspiring to distribute marijuana.

THE COURT: What's the Government's position on that?

MR. PATRICK WHITE: Your Honor, we believe that that instruction is in error. There is but one conspiracy. We just have one conspiracy, cocaine, marijuana, period. It's all part of the organization.

THE COURT: Okay. I agree with the Government.

MR. ENCINOSA: Judge, I would also join in that request.

THE COURT: Everyone joins in it, I guess, unless you opt out.

(Trial Tr. vol. 35 at 5-6.)

(Trial Tr. vol. 35 at 189 (emphasis added).)

> Now, members of the jury, let me just as a footnote say to you that this case is not about murder. <u>This case is about dope, conspiracy to possess with intent to distribute narcotics</u>. There are violent acts in this case in furtherance of the conspiracy, and we have brought forward to you situations of violence that were <u>in furtherance of the drug conspiracy</u>.

(Trial Tr. vol. 35 at 199-200 (emphasis added).)

The Fourth Circuit revisited the <u>Rhynes</u> decision in <u>United States v. Cotton</u>, 261 F.3d 397 (4th Cir. 2001), <u>rev'd</u>, --- U.S. ---, 122 S. Ct. 1781 (2002), where the jury's verdict was a general one as to a conspiracy that charged both powder cocaine and crack. In <u>Cotton</u>, the court held that the jury was unambiguously instructed that the charged conspiracy conviction could only be based on a finding, as charged in the indictment, that the defendants conspired to distribute or possessed with intent to distribute both substances. Continuing, the <u>Cotton</u> court found that the evidence was sufficient to support a construction of the verdict that a jury could find a conspiracy with respect to both substances. The district court's jury instruction, unlike in this case, required the jury to find that the materials involved in the charged conspiracy were cocaine hydrochloride (powder) and crack. The court's charge provided:

> If you find that the materials involved in the charged conspiracy were cocaine hydrochloride and cocaine base, you need not be concerned with the quantities, <u>so as</u> [sic] <u>long as you find that a defendant</u>

28

> conspired to distribute or possessed with intent to distribute these controlled substances, the amounts involved are not important.

Cotton, 261 F.3d at 402 (quoting S.A. 13) (emphasis added).

The Fourth Circuit in Cotton relied on the Fifth Circuit in United States v. Green, which held that, with respect to a general verdict for a conspiracy, "the sentencing court can still conclude that the jury found, beyond a reasonable doubt, guilt for more than just one object-offense" where the jury had not been instructed in the alternative and the evidence "would support such construction of the verdict actually obtained," Green, 180 F.3d at 226. Cotton, 261 F.3d at 402.

The Fifth Circuit in Green was confronted with a conviction of a conspiracy count that alleged over fifty kilograms of cocaine and over 50,000 tablets of phenmetrazine or preludes. The district court limited the sentence of the defendant, Green, to the statutory maximum for preludes. The Fifth Circuit reversed after considering the conjunctive language used in the indictment to describe the controlled substances that were the objects of the conspiracy, the jury instructions similar language, and the overwhelming evidence that the conspiracy involved cocaine and preludes. After finding that the jury found beyond a reasonable doubt for each of the object-offenses (i.e., the cocaine and the preludes), the court held that the verdict was not ambiguous and reversed limiting the sentence to the maximum for preludes.

29

In describing the jury instructions, the <u>Green</u> court opined:

In five instances, the jury instructions refer to the two controlled substances. In four of those five, "and" separates "cocaine" from "phenmetrazine or preludes": the first, that Green "is charged, <u>in Count 1 of the indictment</u> with conspiring to distribute cocaine <u>and</u> phenmetrazine or preludes, controlled substances"; the second, in listing the elements of the offense, that, to find Green guilty, the jury must be convinced beyond a reasonable doubt "[t]hat two or more persons made an agreement to commit the crime of distribution of <u>cocaine, phenmetrazine or preludes as charged in the indictment</u>"; the third and fourth, in the same sentence, that "[t]o distribute cocaine <u>and</u> phenmetrazine or preludes means for one person to intentionally transfer cocaine <u>and</u> phenmetrazine or preludes to another"; and the fifth, and final, that "at the time of the transfer the person making the transfer knew that cocaine <u>and</u> phenmetrazine or preludes were controlled substances".

<u>Green</u>, 180 F.3d at 226 (quoting indictment (emphasis in original)). Significantly, the <u>Green</u> decision also referred to <u>Edwards</u> in its analysis.

The <u>Cotton</u> court also cited an Eighth Circuit case involving an indictment phrased in the conjunctive. In that case, "evidence of all three drugs was introduced" and the court "did not elicit an ambiguous or unclear verdict from the jury," <u>United States v. Watts</u>, 950 F.2d 508, 515 (8th Cir. 1991). <u>Cotton</u>, 261 F.3d at 403. The court in <u>Watts</u> found that there was substantial evidence to support the jury finding of at least one conspiracy.[41] <u>Watts</u>, 950 F.2d at 512.

_____

[41] The <u>Watts </u>court addressed the issue raised by the appellants involving its claim that the court should have given multiple conspiracy jury instructions and stated:

The appellants allege that there was a fatal variance between the indictment and

Based on the record, the Fourth Circuit in Cotton found no Rhynes violation, but concluded that the district court erred in the sentencing phase of the case by imposing sentences in excess of twenty years for seven of the eight defendants convicted. On appeal, the decision in Cotton was reversed with respect to the sentencing issues in the context of Apprendi, but the Supreme Court did not address the Dale-Rhynes issue. United States v. Cotton, --- U.S. at ---, 122 S. Ct. at 1787 (2002).

Against the background of Dale, Rhynes, Cotton, Green, and Watts, we find a Dale-Rhynes violation.[42] Here, the jury instructions were modest in describing

the evidence, and that the court should have given multiple conspiracy jury instructions. The issue of whether a single or multiple conspiracy exists is one for the jury. The district court handled the question through one "all or nothing" instruction. [This instruction] directed the jury to determine whether the single conspiracy alleged in the indictment existed and to determine who were its members. The jury was instructed that if it found more than one conspiracy, it must first determine if any one of the conspiracies was the charged conspiracy and then determine the members of that conspiracy. Thus, the jury did not have the option of convicting each appellant on a different conspiracy (which might well have created a variance with the indictment), but was instructed to find only one particular conspiracy and determine its members. Considering the aforementioned conspiracy cases and viewing the evidence we summarized in the light most favorable to the government, we believe there is substantial evidence to support the jury finding of at least one conspiracy, involving all three appellants, beyond a reasonable doubt.

Watts, 950 F.2d at 512 (internal citation omitted).

[42] We view the question of whether there is a Dale-Rhynes violation to be an issue of first impression in this circuit. In United States v. Riley, 142 F.3d 1254,1257 (11th Cir. 1998), this Court referred to Edwards v. United States, 523 U.S. 511 (1998), and implicitly embraced

31

the nature of the conspiracy. The conjunction "or" crept into the oral instructions. The printed instructions ignored the controlled substance "marijuana" as part of the conspiracy. The declaration of the district court during the Gallashaw sentencing hearing indicates that the printed instructions submitted to the jury were not corrected by adding the omitted reference to marijuana. The court's instructions, unlike the instructions in Cotton, made no reference to the necessity of finding both marijuana and cocaine as a part of the conspiracy. The final argument of the Government failed to pinpoint, as it had in opposing the motion for a special verdict, that the conspiracy concerned both cocaine and marijuana. At no time was the jury advised, either in the court's instructions or in the Government's argument to the jury, that before a charged Defendant could be found guilty of the conspiracy

---

the result in Dale and Rhynes. The holding was only dicta, however, and we did not make any explicit reference to either Dale or Rhynes. We stated:

> There is no plain error here, because there is no error. In a case that is virtually identical to this one, the Supreme Court has rejected the same contention. The Court noted that a sentencing judge is not limited to considering the offense of conviction. Id. Rather, the judge may sentence for both offense conduct and any other "relevant conduct."
>
> The Court stated only two exceptions to this rule. First, if the amount of one substance involved leads to a lower statutory maximum sentence than would apply to the amount of the other substance, then the district court must stay below the lower statutory maximum.

United States v. Riley, 142 F.3d 1254, 1256 (11th Cir. 1998) (internal citations omitted and emphasis added).

32

count, it must find that that Defendant had agreed to participate with both cocaine and marijuana. Nor did the court instruct or the parties argue to the jury that a failure of proof as to either controlled substance, be it cocaine or marijuana, would require an acquittal on Count 1.

Finally, we note that the Government and the district court dispute the Defendants' claim that they sought a special verdict with respect to Count 1. As indicated previously, however, we find that such a request was made. Moreover, as persuasive authority, the Second Circuit has decided that the government carries the burden to seek special verdicts with respect to a conspiracy count charging multiple controlled substances. United States v. Barnes, 158 F3d. 662, 672 (2d Cir. 1998). In any event, we need not reach or decide the issue of burden because we hold that the request of the Defendants for separate verdict forms as to Count 1 constituted a motion for special verdicts.

In sum, we find that the Dale-Rhynes violation requires that the sentences of the six defendants as to Count 1 be vacated. The Second Circuit and the Sixth Circuit differ as to the procedure to be followed after finding a violation.

The Second Circuit in Orozco-Prada decided the issue of remedy once it determined that the single conspiracy count involving marijuana and crack suffered from the lack of a special verdict. The court withheld judgment on Orozco-Prada's

33

conviction for 30 days and gave the government an opportunity to consent to a re-sentencing for the conspiracy conviction based on the maximum established by the lesser controlled substance, i.e., marijuana. In the absence of the government's consent, however, it would vacate Orozco-Prada's conviction on the conspiracy count and remand for a new trial.

The Dale court acknowledged the Second Circuit's remedy in Orozco-Prada, but indicated that it would "effect the same result by remanding the case to the district court to allow the election by the government at the trial level." Dale, 178 F.3d at 434.

We prefer the remedy from Dale, and, thus, remand the case against the Appellants to the district court. The Government shall be granted the opportunity, in a timely fashion, to consent to a re-sentencing of the Defendants as to Count 1 based on a maximum sentence of five years or to elect to proceed against one or more of the Defendants with a new trial on Count 1 with a special verdict.

The recognized remedy for a Dale-Rhynes violation excludes any consideration of a harmless error review. Such a review questions whether a conviction should, despite error during the trial, be affirmed. In this case we do not set aside the convictions of the Defendants, but rather vacate the sentences and remand for re-sentencing, or at the option of the prosecution, allow for a new trial

34

on the Count l conspiracy charge with the understanding that the jury will be provided a special verdict as to Count l.

Smith, Gallashaw and Allen were convicted of substantive drug offenses. Consequently, we now turn to an analysis of the Apprendi issue as it applies to those defendants.

## C. *The Apprendi Issue*

The substantive drug convictions of Smith, Gallashaw, and Allen must be examined to determine the maximum sentence that arises from those convictions, bearing in mind that Smith and Gallashaw received life sentences and Allen received a sentence of 420 months. Apprendi v. New Jersey, 530 U.S. 466 (2000), provides that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. The difficulty in this case with respect to the substantive drug convictions of Smith, Gallashaw, and Allen is that no specific drug quantity was alleged in Counts 4, 10 or 11. Nor was the issue of quantity ever presented to the jury.

The life sentences of Smith, Godfrey, Stokes and Gallashaw, based on the Count 1 conspiracy conviction, clearly exceed the maximum sentence called for by 21 U.S.C. § 841(b)(1)(C), under the Dale-Rhynes analysis. Smith and Gallashaw

35

were convicted on Count 11, which alleged a substantive cocaine offense, but without specifying an amount of cocaine involved in the offense. Allen was convicted of Count 4, which alleged a substantive cocaine offense, but did not specify the amount of cocaine involved. Against such a background as to Smith, Gallashaw, and Allen, an Apprendi sentencing issue arises, separate from the Dales-Rhynes sentencing limitations as to the conspiracy conviction.

We recently held that Apprendi is implicated only when a judge-decided fact actually increases a defendant's sentence beyond the prescribed statutory maximum penalty for the crime of conviction and has no application to, or effect on, cases where a defendant's sentence falls at or below the maximum penalty. United States v. Sanchez, 269 F.3d 1250, 1288 (11th Cir. 2001). Thus, where a specific drug quantity triggers a mandatory minimum sentence or factors into a Sentencing Guidelines calculation, resulting in a sentence at or below the otherwise applicable maximum penalty in § 841(b)(1)(C), no Apprendi error exists.

This circuit has recognized repeatedly that where an Apprendi violation exists, as in this case with respect to the convictions of Smith and Gallashaw, a reviewing court must engage in a harmless error analysis. See, e.g., United States v. Anderson, 289 F.3d 1321, 1326 (11th Cir. 2002). In Anderson, this Court

summarized the precedent with respect to the harmless error analysis of an

Apprendi violation:

> [A]n Apprendi error does not require reversal of the sentence if that error is harmless. See Sanchez, 269 F.3d at 1272-75. . . . Because Apprendi errors are subject to harmless error review, they can provide no relief to the sentenced defendant if they are "harmless beyond a reasonable doubt." Candelario, 240 F.3d at 1307 (quoting Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L. Ed. 2d 705 (1967)).
>
> In the context of drug quantity, "we must affirm [the] sentence if the record does not contain evidence that could rationally lead to a contrary finding with respect to drug quantity." Nealy, 232 F.3d at 830.
>
> . . .
>
> Our en banc decision in Sanchez clearly endorsed the use of harmless error analysis in this context. See Sanchez, 269 F.3d 1250, 1271-72 n.40 (explicitly reaffirming holdings of, inter alia, Nealy, Candelario, and Swatzie). Simply put, the failure to charge or submit to the jury a specific drug quantity is harmless error under Apprendi if, by finding the defendant guilty, the jury necessarily must have found, beyond a reasonable doubt, that a certain quantity of drugs was involved in the offense. Put differently, if no reasonable juror could have found the defendant guilty without also finding that the specific quantity of drugs was involved, then the defendant is not entitled to a resentencing.

Anderson, 289 F.3d at 1326-27 (emphasis added).

Anderson has been reinforced by the recent Supreme Court decision in

Cotton, --- U.S. ---, 122 S.Ct. 1781, which answered in the negative the question of

"whether the omission from a federal indictment of a fact that enhances the

statutory maximum sentence justifies a court of appeals' vacating the enhanced sentence, even though the defendant did not object in the trial court." Cotton, --- U.S. at ---, 122 S.Ct. at 1783. In Cotton, as in this case, the indictment did not allege the amount of the controlled substances charged. The sentences imposed on seven of the eight defendants exceeded the maximum sentence of twenty years provided for in 21 U.S.C. § 841(b)(l)(C).

In a split decision, the Fourth Circuit in Cotton held that the district court overstepped its jurisdictional boundaries by imposing these sentences where the indictment omitted the specific quantity of drugs. Upon review, Chief Justice Rehnquist first analyzed the jurisdictional claim and reasoned that earlier decisions that considered indictment defects jurisdictional were no longer applicable. His analysis then proceeded to apply the plain-error test to the defendants' forfeited claim, citing the well known four-part test of United States v. Olano, 507 U.S. 725 (l993), and as further defined in Johnson v. United States, 520 U.S. 461, 466-67 (1997).[43] After concluding that the error in the indictment, (failing to allege a specific quantity) did not seriously affect the fairness, integrity, or public reputation of judicial proceedings, the Court reversed the Fourth Circuit's decision

---

[43] In essence, the test provides that before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, (3) that affects the appellant's substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of the proceedings.

that limited the defendants' sentences to 20 years.[44]  Cotton, --- U.S. at ---, 122 S.Ct. at 1787.  Consequently, as to Counts 4, 10, and 11, we will engage in the required plain error analysis sanctioned by Cotton in view of the omission of any alleged quantity of the relevant controlled substance in these counts.

The district court opined in sentencing Gallashaw that he was subject to a life sentence based on his convictions for Counts 4, 10, and 11 based on his determination of the amount of controlled substances for which he found Gallashaw to be responsible by applying relevant conduct without regard to the statutory maximum sentence for the substantive offenses.  Again, we begin the

---

[44]  In finding that the error in failing to submit for a jury finding the quantity of drugs involved did not seriously affect the fairness, integrity, or public reputation of judicial proceedings, Chief Justice Rehnquist described the factual setting as follows:

> The same analysis applies in this case to the omission of drug quantity from the indictment.  The evidence that the conspiracy involved at least 50 grams of cocaine base was "overwhelming" and "essentially uncontroverted."  Much of the evidence implicating respondents in the drug conspiracy revealed the conspiracy's involvement with far more than 50 grams of cocaine base.  Baltimore police officers made numerous state arrests and seizures between February 1996 and April 1997 that resulted in the seizure of 795 ziplock bags and clear bags containing approximately 380 grams of cocaine base.  A federal search of respondent Jovan Powell's residence resulted in the seizure of 51.3 grams of cocaine base.  A cooperating co-conspirator testified at trial that he witnessed respondent Hall cook one-quarter of a kilogram of cocaine powder into cocaine base.  Another cooperating co-conspirator testified at trial that she was present in a hotel room where the drug operation bagged one kilogram of cocaine base into ziplock bags.  Surely the grand jury, having found that the conspiracy existed, would have also found that the conspiracy involved at least 50 grams of cocaine base.

Cotton, --- U.S. at ---, 122 S.Ct. at 1786 (footnote and internal citations omitted).

39

sentencing analysis for Counts 4, 10, and 11 with the observation that those substantive counts fail to allege a specific quantity of cocaine or marijuana. 21 U.S.C. § 841 establishes a hierarchy of sentencing maximums based on the quantity of the controlled substance charged. The recent Supreme Court holding in Cotton, however, directs us to examine the evidence as to the three substantive offenses, Counts 4, 10, and 11, to determine if the Government established beyond dispute a specific amount of the relevant controlled substance, despite the omission of a specific quantity in the superseding indictment.

With proof of a quantity between 500 grams and five kilograms, the statutory sentencing range is five to forty years, absent a pre-trial notice of enhancement for a prior drug conviction. 21 U.S.C. § 841 (b)(1)(B). Once the quantity of cocaine proven exceeds five kilograms, the statutory sentencing range is ten years to life imprisonment. See 21 U.S.C. § 841 (b)(1)(A). In the absence of a quantity of cocaine charged, the maximum sentence is twenty years as specified by 21 U.S.C. § 841 (b)(1)(C). The statutory sentencing range for a substantive offense involving less than fifty kilograms of marijuana, and absent a pre-trial notice of enhancement, is five years. 21 U.S.C. § 841(b)(1)(D).

Against the background of the teachings of Cotton, we look to the amount of cocaine established as to Counts 4 and 11 to determine if the maximum sentence

for those substantive offense convictions reaches a life sentence. First, we note that no enhancement was filed as to either Smith or Gallashaw, but such a notice was filed as to Allen. Second, we note that the evidence presented as to Counts 4 and 11 indicated a quantity of crack that would be sufficient to justify a statutory sentencing range of 10 years to life had either count alleged <u>crack</u> in addition to cocaine as part of the substantive offenses. As previously noted, however, neither count alleged crack as part of any substantive offense. Consequently, the findings as to crack, while worthy of consideration as relevant conduct, cannot be considered in determining the maximum sentence possible for the convictions of Counts 4 and 11.

Thus, we examine the record as to the proof of cocaine quantities for the convictions of Smith and Gallashaw on Count 11. Our query is whether the jury must have found that the evidence as to quantity was "overwhelming" and "essentially uncontroverted" so as to justify a maximum sentence beyond twenty years. Next, we shall consider the same question as to Gallashaw and Allen with respect to the Count 4 conviction involving cocaine, and then the marijuana convictions of Smith and Gallashaw in Count 10.

As to Count 4, the Government relied upon Karen Fleisher, an employee of the Miami-Dade Crime Laboratory, to identify the substances and quantities

41

confiscated from Allen's residence. After being qualified as an expert in the field of chemistry and the analysis of controlled substances, Fleisher testified that the substances were cocaine. Her testimony further showed that the substances were in both powder and rock (i.e., crack) form, and weighed, cumulatively, 213.8 grams–158.4 grams of powder and 55.4 grams of crack.[45] That testimony is unchallenged and satisfies the Cotton test of "overwhelming" and "essentially uncontroverted."

As to Counts 10 and 11, the Government called Juan Bruna, a forensic chemist for the Drug Enforcement Agency, to identify the substances and quantities seized from Gallashaw's residence. After being qualified as an expert in the field of forensic chemistry, Bruna testified that the substances were cocaine in powder and crack forms, and marijuana. His analysis further revealed the following drugs: cocaine in the quantities of .14 grams, 69.5 grams, 629.9 grams, and 951.8 grams; crack in the quantity of 232.6 grams; and marijuana in quantities totaling 2273.1 grams. (Trial Tr. vol. 30 at 104-20 (Bruna's testimony about his findings).) Computing the cocaine and crack totals, we find the record supports that approximately 1651.34 grams of powder and 246.2 grams of crack were seized

---

[45] (Trial Tr. vol. 20 at 129-32.)

from Gallashaw's residence as to Count 11.[46]  The Bruna testimony also supports a quantity of marijuana in excess of two kilograms which supports a maximum sentence, absent enhancement, of five years for Count 10.  The Bruna testimony is unopposed and also meets the <u>Cotton</u> test of "overwhelming" and "essentially uncontroverted."

In summary, as to Count 4 the amount of cocaine powder, 158.4 grams, allows for a maximum sentence, absent enhancement, of twenty years.  Thus, the life sentence for Gallashaw as to Count 4 must be vacated and remanded for re-sentencing as to the conviction for Count 4.

As to the convictions of Smith and Gallashaw for Count 11, the amount of cocaine powder, 1651.34 grams, allows for a maximum sentence, absent enhancement, of forty years.  The amount of marijuana established with respect to Count 10 only supports a maximum sentence of five years, absent enhancement. Consequently, the life sentences of Smith and Gallashaw for Counts 10 and 11 must be vacated and remanded for re-sentencing.

---

[46]  The drug totals found here were computed from the amounts specified in the trial testimony.  We note that the Government came up with different totals for the cocaine and crack, despite citing to the same testimony, indicating that the amounts seized were 1160 grams of powder cocaine and 330.1 grams of crack.  (Appellee's Br. at 18.)  The discrepancies do not impact the analysis because the different amounts fall within the same range.

The maximum sentence available for Allen based on his conviction of Count 4 is twenty years unless the notice of enhancement alleging a prior felony drug conviction is proven so as to increase the maximum sentence to thirty years. Allen received a sentence of thirty years after the District Court found that Allen had two prior drug convictions. The Court, however, did not find that the drug convictions were felony drug convictions to support a thirty year sentence for Count 4. But no error has been asserted with respect to the enhancement for the sentence as to Count 4. The balance of the 420 month sentence for Allen was predicated on the consecutive sentence of sixty months based on his conviction for Count 5 charging him with a violation of 18 U.S.C. § 924(c)(1) & (2). The Government has conceded that the conviction for Count 5 must be vacated as the evidence was insufficient to support the conviction. Thus, Allen's sentence of 420 months must be vacated and remanded for re-sentencing.[47]

## V. CONCLUSION

The sentences for all Defendants as to Count 1 are VACATED and REMANDED for the opportunity for the Government to decide within thirty days of the issuance of the mandate whether to retry some or all of the Defendants as to

---

[47] The district court may wish to reexamine the length of sentence to Count 4 as to Allen after the Government makes the election as to a retrial or re-sentencing as to Count 1. It is not entirely clear whether the Court would have sentenced Allen to a total of 300 months for a conviction of Count 4 standing alone.

Count 1 or, alternatively to a re-sentencing of the Defendants based on the five year maximum for marijuana, subject to enhancement notices filed as to Major, Stokes and Godfrey.

The convictions of Gallashaw on Counts 4, 10 and 11 are AFFIRMED. The conviction of Smith on Counts 10 and 11 are AFFIRMED. The conviction of Allen on Count 4 is AFFIRMED.[48]

The sentences imposed on Gallashaw for Counts 4, 10 and 11 are VACATED and REMANDED for re-sentencing. The sentence imposed on Allen for Count 4 is VACATED and REMANDED for re-sentencing. The sentence imposed on Smith as to Count 11 is VACATED and REMANDED for re-sentencing.

---

[48] Other issues beyond those covered in this published opinion are addressed and resolved in a separate unpublished opinion.