[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11809
_____

D.C. Docket No. 1:16-cr-20893-FAM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MONTY RAY GROW,

Defendant-Appellant,

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(October 21, 2020)

Before LUCK, ED CARNES, and MARCUS, Circuit Judges.

PER CURIAM:

A jury convicted Monty Grow of conspiring to commit healthcare and wire fraud, committing healthcare fraud, conspiring to receive and pay kickbacks, receiving kickbacks, and money laundering. The district court sentenced him to 262 months' imprisonment. Grow argues on appeal that his convictions must be reversed because the evidence was insufficient on all counts, the district court's instruction to the jury on the third day of deliberations was coercive and prejudicial, and the district court plainly erred in failing to instruct the jury on the elements of wire fraud. Grow also argues that his twenty-year sentence for conspiracy to commit healthcare and wire fraud must be reversed because it was more than the maximum sentence allowed by the jury's general verdict. After reviewing the record and the briefs, and considering the parties' oral arguments, we affirm Grow's convictions but vacate his twenty-year sentence for conspiracy to commit healthcare and wire fraud and remand for further proceedings consistent with this opinion.

## FACTUAL BACKGROUND

Grow played football in college and the National Football League. But his football career was short-lived. He suffered a career-ending knee injury and retired after playing professional football for only two years. Life then took Grow in a different direction—he invested in real estate and a durable medical equipment company—before he found himself marketing medical products for a variety of companies.

2

In early 2014, Grow started working for InforMD Solutions, a company that marketed compounded medications to doctors for a pharmacy. Compounded medications are made by blending medically active and inactive ingredients into a mixture. They are designed to serve the particular needs of a patient that would otherwise be unmet by commercially available medications.

Grow worked for InforMD as an independent contractor and was paid only commissions. Whenever a doctor prescribed a medication that Grow had recommended, the doctor would fax the prescription to InforMD, which would then credit the prescription to Grow's account and forward it to the pharmacy to be filled. Grow's commissions were calculated using a "tiered multilevel structure," which meant that he was paid for his own referrals and any referrals made by representatives he brought in, any representatives brought in by those representatives, and so on down the pyramid. Grow found it difficult to market compounded medications for InforMD because the doctors he approached often had existing relationships with other marketers.

By October 2014, Grow left InforMD and formed his own marketing company using a similar business model. He teamed up with a pharmacy, Patient Care America, to market three of its compounded medications: a pain cream; a scar cream; and a metabolic vitamin. He also brought over two sales representatives and paid them using the same tiered commission structure. Unlike InforMD, however,

3

Grow's company recruited patients instead of doctors and used telemedicine companies to prescribe the creams and vitamins to patients.

As the head of operations, Grow "typically did not talk to patients." Grow was primarily responsible for helping and recruiting sales representatives, and his representatives were responsible for soliciting recruits.[1] After speaking with a recruit, Grow's representatives would fill out an intake form with basic information about the recruit, including their name, the location of any scars and pain on their body, and whether they wanted the metabolic vitamin. Depending on the telemedicine company Grow used, representatives would also include either a "suggestion" of what the doctor should prescribe or a prefilled prescription for the doctor to do nothing more than sign.

Grow told his representatives to "always" use the prescription codes p-01 for the pain cream and sc-01 for the scar cream because they "paid the highest reimbursement from the insurance company."[2] Grow also told his representatives to pick the largest size for each cream—360 grams—because it "paid the highest

---

[1] We use the term "recruit" to refer to any Tricare eligible beneficiary solicited by Grow's sales representatives to receive prescriptions for Grow's pain creams, scar creams, or metabolic vitamins.

[2] The code p-01 corresponded to a formulation designed to treat "general pain [and] inflammation." The other pain formulations were designed to treat neuropathic pain and chronic pain. The code sc-01 corresponded to a transdermal formulation designed to treat "all scar[s]." The other scar formulations were gel based.

insurance payment" and would give them "the highest commission."[3]  And he said to mark as many refills as possible (either three or six, depending on the telemedicine company) because he and his representatives got "commissions on all the refills."

After everything had been filled out, Grow would forward the materials to a telemedicine company, which would arrange for a doctor to call the recruit.  If the telemedicine doctor couldn't reach the recruit, the recruit's file would be "cancelled."  If the doctor got ahold of the recruit, the doctor would conduct a brief consult—typically between five and seven minutes, but sometimes as short as three minutes—and prescribe Patient Care's creams and vitamins.  Recruits would "rarely" be rejected.  For one of the two telemedicine companies Grow used, doctors issued prescriptions to ninety-seven percent of recruits they spoke with.  The telemedicine companies charged Grow a "consult fee" each time one of their doctors spoke with a recruit.

Once a doctor issued a prescription, the telemedicine company would fax it to Grow.  If the most expensive options had not been prescribed, Grow "would get upset and get [the prescription] changed" by complaining to the telemedicine company's owner.  When Grow was satisfied with a prescription, he would forward it to Patient Care.  Patient Care would then fill the prescription, mail the creams and

---

[3] The creams came in four sizes: 120 grams, 180 grams, 240 grams, and 360 grams.  All were considered to be a monthly supply. To use up the 360-gram cream in a month, a patient would need to apply the cream at least twelve times a day.

5

vitamins to the recruit, and submit a claim for reimbursement to the recruit's insurance company. Patient Care would also charge recruits a copay, but Grow told recruits (and told his representatives to tell their recruits) that they didn't need to pay their copays because Patient Care would never collect on them. Grow and his representatives usually were correct about that, but sometimes Patient Care would send follow-up bills to recruits. When that happened, Grow told his representatives that they could pay the copays for the recruits.

Grow's company marketed exclusively to recruits insured by Tricare, the government's health insurance program for military personnel and their families. From his time at InforMD, Grow knew that Tricare was "the best payer" because it would always approve claims for compounded medications. And Tricare paid for Patient Care's creams and vitamins at exorbitant rates. A single bottle of the metabolic vitamins cost Patient Care only $76.90 to produce but was reimbursed by Tricare at a rate of $6,164.31—a profit of $6,087.41. The profit on 360-gram jars of pain and scar cream was $5,329.15 (for a jar of pain cream) and $15,729.82 (for a jar of scar cream). Grow split the profits with Patient Care evenly, which meant that he earned approximately $13,500 for each recruit that ordered the creams and vitamins. Grow received the same percentage commission on any refills, too.

If one of Grow's sales representatives referred a recruit who got prescribed creams and vitamins, Grow would share a cut of his commission with that

representative and any other representatives in their "upline." The payout differed depending on the representative and their position in the hierarchy. Some, at the bottom, received only a two-percent cut of the profits. Grow's most successful sales representative—Ginger Lay—received a forty-percent cut, minus the cost for the telemedicine consults.

Grow's representatives weren't the only ones getting paid. Some recruits got paid commissions just for ordering their own creams and vitamins. Grow also helped Lay set up a survey program where recruits were paid $1,000 a month to try the creams and vitamins and write about their experiences. Lay did nothing with the results of the survey; its purpose was simply "[t]o refer more Tricare beneficiaries and get paid commissions."

Aside from earning commissions, Grow also made money by selling Patient Care a wetting agent to use in its creams. Specifically, Grow sold ethoxydiglycol under the brand "Ethoxy Gold" for $12.50 per milliliter, which Tricare would reimburse at somewhere between $55 to $60 per milliliter. Grow told Patient Care that the reimbursement rate for Ethoxy Gold was "advantageous" and it could use Ethoxy Gold to fill up to twenty percent of the total volume of a cream.

At its peak, Grow's company was making $2 million every two weeks and had approximately 130 sales representatives covering as many as 650 recruits. Grow did not let his earnings go to waste—he bought two jet skis for $24,521.36, a

Range Rover for $90,478.45, a Porsche 911 for $105,544.94, and a waterfront mansion for $1,539,815.42. However, sometime in May 2015 Tricare caught on and stopped paying for Patient Care's creams and vitamins, so Grow's business "ceased to exist."

## PROCEDURAL HISTORY

In November 2016, a grand jury indicted Grow in the Southern District of Florida. Grow was later charged in a superseding indictment with the following counts:

| Count 1: | conspiracy to commit healthcare fraud and wire fraud, in violation of 18 U.S.C. section 1349; |
|---|---|
| Counts 2–8: | healthcare fraud, in violation of 18 U.S.C. section 1347; |
| Count 9: | conspiracy to pay and receive healthcare kickbacks, in violation of 18 U.S.C. section 371;[4] |
| Counts 10–14, 17–18, 20, 22–26, 28–33[5]: | receipt of kickbacks in connection with a federal healthcare program, in violation of 42 U.S.C. section 1320a-7b(b)(1)(A); |

[4] Count nine charged three objects: (a) soliciting and receiving kickbacks from Patient Care for referring patients, in violation of 42 U.S.C. section 1320a-7b(b)(1)(A); (b) offering and paying kickbacks to patients for ordering medications, in violation of section 1320a-7b(b)(2)(B); and (c) offering and paying kickbacks to representatives for referring patients to Patient Care, in violation of section 1320a-7b(b)(2)(A).

[5] The unlisted counts were against Lay, who was charged as a codefendant. Lay pleaded guilty to conspiring with Grow to commit healthcare fraud and testified against Grow at his trial.

8

| Counts 36–41, 43–44: | payment of kickbacks in connection with a federal healthcare program, in violation of 42 U.S.C. section 1320a-7b(b)(2)(B); |
|---|---|
| Counts 45–49: | money laundering, in violation of 18 U.S.C. section 1957; and |
| Counts 50–51: | misbranding drugs, in violation of 21 U.S.C. sections 331(k) and 333(a)(1) |

The case went to trial in January 2018.  In opening statements, the government said it would prove that Grow was running a "pyramid scheme of kickbacks" to induce Tricare beneficiaries to order expensive creams and vitamins that they didn't need.  For his part, Grow, through his attorney's opening statement, described himself as a "salesperson" and "marketer" who set up a "multi-level marketing company."  He said he had "one rule"—that recruits had to "need the product"—and that he complied with the rule by having telemedicine doctors prescribe the creams and vitamins to the recruits he marketed to.  The doctors, Grow said, had "independent judgment" whether to prescribe the creams and vitamins, and he purposely paid the telemedicine companies a flat fee for consults—regardless if creams and vitamins were ultimately prescribed to the recruit—so that his payments wouldn't be considered illegal kickbacks.  To the extent recruits received creams and vitamins that they didn't need or without speaking to a doctor, Grow said they were "outliers" and that "mistakes . . . were made."

The jury heard from several recruits involved in Grow's scheme, many of whom testified that they didn't need the creams and vitamins prescribed to them.

9

For example, 68-year-old Philip Snodgrass said that he wasn't looking for a pain cream, scar cream, or vitamins when one of Grow's representatives called him to market the compounded medications. Nor was he already taking pain medications or scar remedies. Instead, he got the creams and vitamins because he was promised money. And when he later got the creams and vitamins but learned that he'd have to pay a copay, he complained to Patient Care.

Witness after witness told a similar story. Blair Von Letkemann said he was approached by a friend about the creams because the friend "knew that [Von Letkemann] was having . . . financial issues." Von Letkemann didn't think he needed the creams, but he signed up for the survey anyway because "[i]t was an easy way to make a little bit of extra money." Even after he tried the creams, he didn't think the pain cream worked and the scar cream was no better than "standard lotion." Von Letkemann never even spoke to a doctor before receiving the creams. If he knew Tricare had to pay more than $25,000 for the creams, he never would have agreed to order them.

James Featherston also testified that he wouldn't have ordered the creams and vitamins if he knew how much Tricare was paying for them. And he wasn't looking for a pain cream or scar cream when one of Grow's representatives approached him about the recruit survey. Although he signed up for it, he called Patient Care to complain as soon as it looked like he wasn't going to get paid. Featherston also said

10

that a man called him to discuss the creams and vitamins after he signed up for the survey, but he didn't remember the man ever saying he was a doctor. Nor did Featherston remember speaking to Pamela Svendsen, the prescribing physician listed on his prescription.

Nichole Powell also said that she didn't need the creams and vitamins she signed up for. And she received some of the creams and vitamins before speaking to a doctor. She recruited her husband to sign up for the creams and vitamins and he also received them without speaking to a doctor. Powell said she would not have ordered the creams and vitamins if she had to pay a $60 copay for them. "Deep down inside [she] felt like [she] was doing something wrong every time [she] got paid."

Rosalinda Rambaran ordered the creams and vitamins for herself, her husband, and her adult son. When asked why she signed up her husband, she said: "[i]t was just a way that I could make some money." Similarly, Rambaran's son said that he signed up for the creams and vitamins "[t]o help [his] family get some money."

Jill Cichowicz testified that she got paid simply for ordering her own creams and vitamins. She thought she was signing up for a job opportunity but instead got "paid to do nothing." A red flag went up in her mind as soon as she got her first payment.

11

Josie Brundige testified that she never spoke with a doctor about the cream she received. She received the scar cream even though she did not have any scars and despite the fact that the intake form Grow's representative prepared for her also said that she had no scars.

Mike Ewton said that he didn't need the creams and vitamins he received. He decided to sign up himself and his wife for the creams and vitamins because of their financial troubles. They "needed some money and everybody was getting some money and [they] wanted a piece." To Ewton, "[i]t felt dirty to begin with."

Jonelle Coronado testified that Grow told her she could get paid for ordering her own creams and vitamins. Taking Grow's advice, she did order her own creams and vitamins, but she soon decided to stop the shipments because she "felt like [she] had gotten a large amount of money . . . for doing nothing."

Grow moved for judgment of acquittal on all counts at the end of the government's case and again at the close of evidence. He specifically argued that the government failed to prove healthcare fraud because there was no evidence that any of the claims submitted to Tricare were fraudulent—in other words, there was no evidence that the claims contained false information or omitted material information. Grow also argued that, even if some claims were fraudulent, there was no evidence that he knew they were fraudulent.

In response, the government argued that the claims were fraudulent because recruits were induced by kickbacks to order creams and vitamins that they didn't need, recruits were told they didn't need to pay copays or had their copays paid for them, Grow told his representatives to always select the most expensive options, Grow paid for the telemedicine doctors' consults and complained when they didn't prescribe the most expensive options, some recruits received creams and vitamins without even speaking to a doctor, and Grow "fraudulently inflate[d]" the price of the creams with Ethoxy Gold. The government argued that a reasonable jury could rely on the circumstantial evidence in the record to infer Grow's knowledge of the fraud. The district court entered judgment of acquittal for Grow on the misbranding charges but otherwise denied his motion.

The district court then held a charge conference. Grow's proposed instructions did not include language instructing the jury on the elements of wire fraud—one of the dual objects of the conspiracy charged in count one. The district court adopted Grow's proposed conspiracy instruction—the one that did not include an instruction on the elements of wire fraud. As a result, the jury was never instructed on the elements of wire fraud.

The jury began its deliberations on a Wednesday morning. Before giving the case to the jury, the district court explained: "There's no minimum time, no maximum time. Now you are in control of how long you work." The jury continued

13

its deliberations the following day, and the district court again told the jury: "[t]ake as long as you want . . . to decide, and we'll see you whenever you want to be seen." By Friday afternoon, the jury had still not returned a verdict. The district court proposed telling the jury that it could continue "to work till five" and then "come back [on] Monday." The court also suggested that it would tell the jury: "if you have reached any decision on any count, you can take partial verdicts." Grow objected, arguing that the court "should not be getting in the purview of [the jury's] deliberations." He claimed that the court's proposed instruction would prejudice him by giving the jury "the opportunity to say, we give up, we're going to compromise." The district court overruled Grow's objections and instructed the jury as follows:

> Several things I want to tell you. First, I always give an opportunity to the jurors, just like I did for you to walk during lunch, to walk into the courtroom. Sometimes that's a good thing, and I told you when we selected you as jurors, and even now, there's no minimum time and there's no maximum time. So I don't want you to think that anybody, certainly not the judge, is interfering. Remember, I said I'm a judge of the law, you're the judge of the facts. You take as long as you want or as little as you want.

> But since I'm giving you the opportunity to stretch your legs— it's not even the seventh inning stretch because you decide how long you stay, and I wanted to tell you because of a scheduling conflict that I have at the end of the day, though some days we have worked till 6:30 and thereabouts, today we are going to work only until around 5:00. Okay? That doesn't mean that you have to reach a decision by 5:00 on any count or on all the counts. You can decide how many counts you want to reach decisions on, what counts you cannot reach decisions on, reach decision on all, one way or another. That's your business, not the

14

judge's business.  There's never any minimum.  But out of courtesy, then I'll bring you back.  Like I told you, now you're the decision-makers of your time, not just of the very important thing of deciding whether the Government has proven its allegations on each count.  You'll come back on Monday and I have another jury trial, but we'll let you use the same jury room and we'll figure out what to do.  We've done that already in this case.

But I don't want you to misinterpret.  I usually take an afternoon break with the jurors to see how long it takes.  You're very conscientious.  Both sides are very appreciative of the care based on the questions that you've asked and how you are looking at exhibits in this very complicated case, going count by count.  You do what you want and you're free to ask questions if you want of each other.  You don't even have to ask me any questions.

But out of courtesy, I thought I would let you know, because we have worked till 6:30 sometimes, that today it will be 5:00.  Again, that's not an indication that you should reach a decision on all counts before then.  You decide what you want to do, when you want to do it and how you want to do it.  All right?

So I'm going to be doing other things.  So you keep working.  We won't interfere with you.  All right?

Thank you very much.  We'll see you whenever you want to be seen.

Later that afternoon, the jury sent out a note saying that it wanted to leave for

the day.  Before releasing the jury, the district court reiterated:

No minimum, no maximum time.  Take all the time you want . . . . We want you to be conscientious, take this seriously, as you have, and take all the time you want.  I'll be doing other things, so we will find another jury room.  There's never any pressure whatsoever on you, except to follow the law and look at the evidence and I think that's what you're doing, and take all the time you want.

15

The court told the jury to return on Monday morning at 8:30 a.m. and said that the jury would only be deliberating until 1:00 p.m. because one of the jurors had to leave for a doctor's appointment.  The court encouraged the jurors to bring something to eat because they would be working "straight through" without a lunch break.  However, the court made clear that the jury could take as long as it wanted: "Just work straight through, and then Tuesday, Wednesday, Thursday, Friday, Saturday, there's absolutely no problem whatsoever."

On Monday, the jury had not yet reached a verdict by noon.  Without objection, the district court reminded the jury that there wouldn't be a lunch break because the jury would be retiring at 1:00 p.m. to accommodate a juror's doctor's appointment.  The court repeated that there was "no maximum time," the jury could "take as long as [it] want[ed]," and the jury would return to continue deliberations the following morning if it did not reach a decision by 1:00 p.m.  The court also polled the jury about scheduling conflicts for the next few days.

At 12:48 p.m., the jury returned a complete verdict.  The jury entered a general verdict of guilt on count one, finding Grow guilty of conspiracy to commit healthcare fraud and wire fraud without specifying which object Grow had conspired to commit.  The jury also found Grow guilty of healthcare fraud involving recruit Blair Von Letkemann as charged in count five.  Finally, the jury found Grow guilty of conspiracy to pay and receive kickbacks, thirteen counts of receiving kickbacks,

16

and one count of money laundering.  The jury acquitted Grow on all remaining counts.

The probation office later prepared a presentence report that listed the maximum penalty for count one as twenty years' imprisonment, the statutory maximum for conspiracy to commit wire fraud.  See 18 U.S.C. § 1343.  Grow objected to the report and argued that he should be sentenced based on the ten-year statutory maximum for healthcare fraud.  He contended that because the jury returned a general verdict it was impossible to tell whether the jury had found him guilty of conspiracy to commit healthcare fraud, conspiracy to commit wire fraud, or both.  The district court overruled Grow's objection.  The court calculated Grow's guideline range at 210 to 262 months' imprisonment and sentenced him to 240 months on count one (the statutory maximum for conspiracy to commit wire fraud), 22 months on count five to run consecutively to count one, and 60 months on all other counts to run concurrently.  The district court also sentenced Grow to three years of supervised release on all counts.

## DISCUSSION

Grow raises four issues on appeal.  First, he challenges the sufficiency of the evidence on all counts.  Second, he argues that the district court's instruction to the jury on Friday afternoon, during the third day of deliberations, was coercive and prejudicial.  Third, he contends that the district court plainly erred in failing to

17

instruct the jury on the elements of wire fraud.  And fourth, he argues that his sentence for conspiracy to commit healthcare fraud and wire fraud exceeded the statutory maximum allowed by the jury's general verdict.

### Sufficiency of the Evidence

"We review de novo the sufficiency of the evidence to support a conviction, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences and credibility choices in the verdict's favor." United States v. Deason, 965 F.3d 1252, 1262 (11th Cir. 2020) (citation omitted).  "A guilty verdict 'cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt.'"  Id. (citation omitted).  "The evidence need not 'exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt,'" United States v. Cabezas-Montano, 949 F.3d 567, 595 n.27 (11th Cir. 2020) (citation omitted), because "the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt," United States v. Campo, 840 F.3d 1249, 1258 (11th Cir. 2016) (citation omitted). "The test for sufficiency of evidence is identical regardless of whether the evidence is direct or circumstantial, and no distinction is to be made between the weight given to either direct or circumstantial evidence." United States v. Guevara, 894 F.3d 1301, 1307 (11th Cir. 2018) (citation and quotation marks omitted).

18

*Conspiracy to Commit Healthcare and Wire Fraud*

The jury convicted Grow of conspiracy to commit healthcare and wire fraud. A person is guilty of healthcare fraud if, "in connection with the delivery of or payment for health[care] benefits, items, or services," he knowingly and willfully executes a scheme "to defraud any health[care] benefit program" or "to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health[care] benefit program." 18 U.S.C. § 1347(a); see also id. § 1349 (prohibiting conspiracies to commit healthcare fraud). To convict Grow of conspiracy to commit healthcare fraud, the jury had to find: (1) that the conspiracy existed; (2) that Grow knew of the conspiracy; and (3) that he knowingly and voluntarily joined the conspiracy. See, e.g., United States v. Chalker, 966 F.3d 1177, 1185 (11th Cir. 2020). The jury was entitled to rely on circumstantial evidence to find a healthcare fraud conspiracy, and it didn't need to find that Grow "knew all of the details or participated in every aspect of the conspiracy." Id. (citation omitted). Instead, the jury simply had to find that Grow "knew of the essential nature of the conspiracy." Id. (citation omitted).

Grow does not contest that Tricare was a healthcare benefit program within the meaning of section 1347. And he does not dispute that he targeted Tricare or that Tricare paid millions of dollars for the creams and vitamins he peddled. Instead,

19

Grow argues "[t]here was no evidence that any claim Patient Care . . . made to Tricare was fraudulent, much less that [he] knew any to be."

We conclude that there was sufficient evidence of fraud. Recruits were prescribed, and Tricare was billed for, pain creams, scar creams, and vitamins that were not medically necessary. See United States v. Gonzalez, 834 F.3d 1206, 1214 (11th Cir. 2016) ("A person makes a false claim if the treatments that were billed were 'not medically necessary or were not delivered to the patients.'" (alteration adopted and citation omitted)). Blair Von Letkemann testified that he never spoke to a doctor before receiving the creams. Nichole Powell testified that she didn't need the creams and vitamins, and she received some of them before talking to a doctor. Powell's husband likewise received the creams and vitamins before talking to a doctor. Josie Brundige testified that she got the creams and vitamins even though she didn't have any scars and never spoke to a doctor. And Mike Ewton testified that he didn't need the creams and vitamins he received.

It is no answer to say, as Grow does, that the creams and vitamins were "provided pursuant to valid prescriptions issued by doctors who lawfully consulted with the patients telephonically." A doctor's prescription is not a get-out-of-jail-free card. We have found sufficient evidence of healthcare fraud or conspiracy to commit healthcare fraud even where a doctor prescribed the treatment or medication. See,

e.g., United States v. Ignasiak, 667 F.3d 1217 (11th Cir. 2012); United States v. Mateos, 623 F.3d 1350 (11th Cir. 2010).

For example, in Ignasiak a licensed medical doctor was convicted of healthcare fraud because he prescribed "unnecessary or excessive quantities of controlled substances without a legitimate medical purpose." 667 F.3d at 1219. We concluded there was sufficient evidence of fraud even though his employees testified that he "always interviewed and examined his patients before they got a prescription." Id. at 1220–21, 1227–29. Similarly, in Mateos, a doctor and a nurse were convicted of conspiracy to commit healthcare fraud for their work at an HIV clinic. See 623 F.3d at 1354. The clinic had doctors prescribe HIV treatments to the patients, id. at 1356–57, but we still concluded that the evidence was sufficient to support the defendants' convictions, id. at 1361–63. As for the defendant doctor, we relied on the circumstantial evidence that showed the treatments were medically unnecessary. Id. at 1362. Specifically, we noted that the doctor "was trained . . . to document each patient's chart in the same manner; . . . she was present when patients at [the clinic] screamed about wanting more money; and the billing code number on the Medicare superbills she signed was always the same, regardless of what the patient charts said." Id. As for the defendant nurse, we rejected her argument that she "merely provided the patients with treatments the doctors prescribed." See id. at 1363. We concluded that "[t]he presence of fraud at [the clinic] was so obvious

that, as with [the doctor], [the nurse's] knowledge of its character could fairly be attributed to her." Id.

The issue in Ignasiak and Mateos was not whether a doctor prescribed whatever was billed to the benefit program, but whether what was billed was medically necessary. Here, as in those case, there was sufficient evidence that the patients were receiving medically unnecessary treatments and prescriptions.

We also conclude that there was sufficient evidence of Grow's knowledge of the fraud and his intent to defraud. "[I]n a health[care] fraud case, the defendant must be shown to have known that the claims submitted were, in fact, false." United States v. Medina, 485 F.3d 1291, 1297 (11th Cir. 2007). "Although the government must prove the defendant's knowledge of falsity, a defendant's knowledge can be proven in more than one way." United States v. Clay, 832 F.3d 1259, 1311 (11th Cir. 2016). "Representations made with deliberate indifference to the truth and with intent to defraud adequately satisfy the knowledge requirement in [section] 1347 cases." Id. Here, the jury could reasonably find that recruits didn't need the creams and vitamins they were prescribed, that Grow was deliberately indifferent to that truth, and that he had an intent to defraud.

First, there was evidence that Grow and his representatives told the telemedicine doctors what to prescribe before the doctors consulted with recruits. Specifically, representatives prepared prefilled prescriptions or intake forms with

22

suggestions, which Grow forwarded to the telemedicine companies. Grow told his representatives to "always" select the same options, noting that they paid "the highest reimbursement from the insurance company" and would result in "the highest commission." Grow was indifferent to whether the recruits actually needed the creams and vitamins; when Lay asked him what she should do if a recruit didn't have a scar, Grow said: "everybody has scars, so always choose a scar cream." At least one recruit received scar cream despite not having any scars. Grow knew the recruit didn't have any scars because her intake form that the recruit's representative sent to Grow said just that.

Grow argues that this evidence shows he was simply doing what "many pharmaceutical sales representatives do." But a reasonable jury could find knowledge of the fraud, and an intent to defraud, from Grow sending prefilled prescriptions and intake forms to the telemedicine companies already checked off with creams and vitamins that had the highest reimbursement rates, with the most refills, and in the largest sizes.

In United States v. Melgen, 967 F.3d 1250, 1255–56 (11th Cir. 2020), for example, the government charged a doctor with Medicare fraud because he prescribed medically unnecessary treatments for a particular eye condition. The government "alleged that the scheme involved 'pre-filling' some patient files so that [the eye condition] was a default diagnosis even before [the defendant] met with a

patient." Id. at 1256. On appeal, the defendant challenged the sufficiency of the evidence and argued that "the evidence supported a finding that any 'mistakes' in diagnosing patients were not willfully false and that he reasonably believed the treatments were required." Id. at 1263. We rejected his argument because it went "to the weight of the evidence, and not its sufficiency." Id. Although the defendant had offered innocent explanations for some of the evidence against him—he claimed that "pre-prepping diagnoses before [he] saw patients might have led to honest mistakes"—we said "those explanations were for the jury to weigh, not us." Id. And we concluded that the jury reasonably could have "seen pre-prepping as a sign of [his] willful choice to treat the vast majority of his patients . . . whether or not it was medically necessary." Id.; see also United States v. Pon, 963 F.3d 1207, 1236–37, 1239 (11th Cir. 2020) (concluding that there was "overwhelming evidence" of doctor's healthcare fraud and noting he had prefilled some patients' diagnostic charts before seeing the patients).

Second, there was evidence that Grow regularly complained to the telemedicine company owners about their doctors' prescriptions. Specifically, Lay testified that if the most expensive options had not been prescribed, Grow "would get upset and get [the prescription] changed." This was borne out in several emails the government introduced into evidence. Grow wrote to one company's owner, "After your first dr would not write a script for scar, i had my other telemed network

24

go to work on it." Grow also complained that a particular doctor "[did] not write refills" and said, "Do you have another dr in [New York] to consult this patient or do i need to pursue other avenues?" Grow complained about the same doctor to another company's owner, stating that the doctor was "terrible" because he "[didn't] write half the time and [gave] 0 refills." One time, the owner of a telemedicine company reached out to Grow and asked, "What do you need on this one?" Grow answered that he needed the most expensive options: "360 grams checked and refills." Grow would not rest even on a holiday—at 7:52 p.m. on New Year's Eve, Grow wrote to one company's owner that he "received 3 scripts back . . . from 2 different dr's and neither one of them wrote for 360 grams." Grow continued, "This is a tremendous difference in reimbursement. Is there a way we can fix this?"

Grow suggests that this evidence shows he was simply seeking "a second doctor's opinion." But a reasonable jury could find an intent to defraud from Grow's complaints about the "tremendous difference in reimbursement" and his threats to "pursue other avenues." Grow's complaints and threats could reasonably be seen as pressuring the telemedicine doctors to prescribe the most expensive options even if there was no medical need for the expensive compounded medications.

Third, there was evidence that Grow pushed Patient Care to use a premium ingredient in its compounded medications that was vastly more expensive but otherwise identical to the regular ingredient. (The district court called this "the

25

spaghetti in fancy Italian restaurants.")  Specifically, Grow sold Patient Care his brand of ethoxydiglycol—Ethoxy Gold—and emphasized its "advantageous" reimbursement rate.  But Patient Care could also buy "regular ethoxydiglycol" from a wholesaler for much cheaper, which Tricare reimbursed at a much less generous rate.  Patient Care's lead pharmacy technician testified that he saw no functional difference between Ethoxy Gold and regular ethoxydiglycol.  If anything, Ethoxy Gold was less convenient because it came in one-milliliter vials instead of four-liter jars like regular ethoxydiglycol.  In fact, Patient Care stopped using Ethoxy Gold as soon as Tricare dramatically reduced its reimbursement rate.

Grow argues that the Ethoxy Gold evidence shows he simply wanted to profit from Tricare's favorable reimbursement rates.  But a jury could reasonably conclude that Grow and Patient Care used Ethoxy Gold for no other reason than to fraudulently inflate Tricare's reimbursement rates.

In Melgen, for example, the defendant regularly prescribed a $2,000 drug and "only rarely prescribed" the equivalent, less expensive drug that cost $50.  967 F.3d at 1255.  We explained that the defendant's profit motive was evidence of his intent to defraud.  See id. at 1263.  In another recent case, the defendant's fraud scheme included billing for expensive off-site urine tests instead of in-office tests because they generated more revenue.  United States v. Ruan, 966 F.3d 1101, 1125–26 (11th Cir. 2020).  On appeal, we held that this was evidence of healthcare fraud.  Id. at

26

1143.  Similar to Melgen and Ruan, Grow and Patient Care's profitable use of Ethoxy Gold served no benefit—it was a medically inactive ingredient and was less convenient to use.

Fourth, there was evidence that Grow made a huge profit from the fraud.  He made about $13,500 for each recruit that signed up for all three of Patient Care's compounded creams and vitamins.  And he earned the same amount on any refills.  In total, Grow made almost $20 million in gross profits.

Grow argued at trial that this showed "his goal was to make money within the confines of the law."  But a reasonable jury could find an intent to defraud from the money Grow made from billing Tricare for creams and vitamins that were not medically necessary.  As we've explained, "[e]vidence that the defendant profited from a fraud may . . . provide circumstantial evidence of the intent to participate in that fraud."  United States v. Machado, 886 F.3d 1070, 1083 (11th Cir. 2018); see also United States v. Bajoghli, 785 F.3d 957, 966–67 (4th Cir. 2015) ("[E]vidence of financial gain is particularly probative in a fraud case to establish the defendant's intent to defraud.").  In Machado, for example, we found that the defendant's profit was "circumstantial evidence of his intent" where he fraudulently obtained $739,900 in mortgage loans.  Id. at 1074, 1083.  In another case, we said the defendant's profit of "over $450,000" was evidence of his intent to defraud.  United States v. Naranjo, 634 F.3d 1198, 1207–08 (11th Cir. 2011).  Grow's profits were forty times more.

27

Fifth, there was evidence that Grow and Patient Care tried to conceal aspects of their scheme. Patient Care told Grow that he needed to remove his fax number from the prescriptions he submitted because they could "only have the MD's fax info or nothing at all." Patient Care later warned Grow not to "show outside fax #'s on these Rx's" because "[t]here is a HIPPA [sic] concern around unsecure pathways & patient brokering concerns when speaking around scripts not coming directly from the MD." Patient Care again told Grow: "Cannot have md to u to us trail." As a result, both Grow and Lay started whiting-out their fax numbers on prescriptions.

Grow also became concerned that there was an issue with Patient Care paying commissions to independent contractors like him because it could violate the anti-kickback statute. Patient Care and Grow then decided that "everybody had to become W-2 employees," and Patient Care hired over a hundred of Grow's representatives. No one from Patient Care met or interviewed any of Grow's representatives before hiring them. Nor was Patient Care particularly concerned with the representatives' credentials. One of the people hired was a teenager who had last worked as a part-time cook at a pizza buffet; his responsibilities there included "mak[ing] sure the buffet [was] always fresh." Another representative "already had a job" and accepted Patient Care's offer only so he could keep getting commission payments. No one was trained. Patient Care fired everyone only six to eight weeks later when Tricare stopped paying for the compounded medicines.

28

Grow argues that this evidence shows he relied in good faith on Patient Care's instructions on how to comply with the law. But a reasonable jury could also find that Grow and Patient Care were trying to conceal the fraud scheme. See United States v Schmitz, 634 F.3d 1247, 1251, 1264 (11th Cir. 2011) (finding sufficient evidence of fraud based, in part, on the defendant "conceal[ing] her scheme by submitting fraudulent reports about hours worked and work activities"); see also United States v. Davis, 490 F.3d 541, 549 (6th Cir. 2007) (noting that an intent to defraud "can be inferred from efforts to conceal the unlawful activity" (citation omitted)).

Sixth, there was evidence Grow paid his representatives to recruit more people to order creams and vitamins and the representatives paid recruits and told them they didn't have to pay Tricare copays. Grow argued at trial that he thought he was legally paying commissions to his representatives and any payments to recruits were mistakes. But a reasonable jury could find that Grow had an intent to defraud because he paid, and had his representatives pay, kickbacks for the recruits to order the creams and vitamins. Although paying kickbacks related to healthcare is itself a type of healthcare crime, "alone," without some other evidence of fraud, it "is not sufficient to establish health[care] fraud" in violation of sections 1347 and 1349. Medina, 485 F.3d at 1298. But, together with other evidence, we've treated paying kickbacks as evidence of healthcare fraud. See, e.g., Gonzalez, 834 F.3d at 1216

29

(finding evidence sufficient to support conspiracy to commit healthcare fraud and emphasizing that the defendant "was personally involved in paying cash kickbacks behind locked doors to each and every recruit who was purportedly treated" which "practically scream[ed] that something amiss was taking place").  Paying recruits and recruiters gave them a financial incentive to order more and expensive creams and vitamins that were not medically necessary.  As the recruits testified at trial, they didn't need the creams and vitamins and only ordered them because they wanted to get paid.

Finally, Grow's own trial testimony was sufficient evidence of his knowledge of the fraud and his intent to defraud.  In a healthcare fraud case, as in other criminal cases where intent and knowledge are in dispute, we've said that "[a] defendant who chooses to testify runs the risk that the jury will disbelieve [his] testimony, and 'runs the risk that if disbelieved the jury might conclude the opposite of [his] testimony is true.'"  Mateos, 623 F.3d at 1362 (citation omitted).  "This is especially so in cases . . . that turn mainly on subjective elements, like a defendant's intent or knowledge."  Id.  So when Grow testified that he didn't intend to violate any law, he didn't think he did anything illegal, he thought doctors were writing prescriptions for creams and vitamins that recruits actually needed, he didn't know that any recruits had been paid for their own prescriptions, and he never caused a fraudulent claim for payment to be filed, the jury was entitled to conclude that he was lying and infer the opposite

30

was true. Id. ("When Alvarez insisted that she did not know that the procedures she prescribed were medically unnecessary, or that the bills she signed were being doctored to obtain payment from Medicare, the jury was entitled to conclude that she was lying, and we must accept that credibility determination."). We conclude that the evidence was sufficient to support Grow's conviction for conspiracy to commit healthcare fraud.[6]

*Healthcare Fraud*

The jury convicted Grow of healthcare fraud based on Tricare reimbursing Patient Care for a pain cream prescription that was filled for Blair Von Letkemann. Grow argues the evidence shows that "nothing about that prescription was false or fraudulent." Grow also argues that the evidence "does not prove that [he] participated in this offense" because he "never met [V]on Letkemann and had nothing to do with his prescription; Lay alone recruited [Von Letkemann] using her survey."

"A defendant may be convicted of health[care] fraud if he aid[s], abets, counsels, induces, or procures the commission of the offense, or if he willfully causes the offense to be committed." United States v. Sosa, 777 F.3d 1279, 1292 (11th Cir. 2015) (citing 18 U.S.C. § 2). Here, the government charged Grow with

---

[6] We do not address the wire fraud object of the conspiracy because "[t]his Court has long held that where there is a conviction for a multi-object conspiracy, the evidence must only be sufficient to sustain a conviction for any one of the charged objectives." Medina, 485 F.3d at 1301.

31

aiding and abetting, so it didn't need to prove that Grow met or recruited Von Letkemann.    Instead, it had to show that "(1) someone committed the substantive offense; (2) [Grow] contributed to and furthered the offense; and (3) [Grow] intended to aid in its commission."    See id.    In other words, the government had to prove that Grow took an affirmative act in furtherance of the fraud with the intent of facilitating its commission.    See id.

Here, there was sufficient evidence that Von Letkemann's prescription was fraudulent.    Von Letkemann testified that he signed up for Lay's survey not because he needed the creams, but because "[i]t was an easy way to make a little bit of extra money."    He also said that he didn't speak with a doctor before receiving the creams. And Lay said she knew that recruits didn't need the creams and vitamins she was recommending; according to her, it "was never even a question."    It was clearly fraudulent to bill for creams and vitamins that a recruit didn't need and which he was somehow prescribed without speaking to a doctor.    See Gonzalez, 834 F.3d at 1214 ("A person makes a false claim if the treatments that were billed were 'not medically necessary . . . .'") (alteration adopted and citation omitted)).

The evidence also showed that Grow took multiple affirmative acts to further the fraud.    Grow helped Lay create the survey that Lay used to recruit Von Letkemann.  Grow discussed the survey with her and had it sent to Patient Care for review.  Grow brought Lay to Patient Care and acted as a self-described "liaison"

32

between the two.  Grow was the money go-between for all of Lay's recruits—the money would go from Patient Care to Grow, Grow would take his cut, and only then would Grow pay Lay her share based on the prescriptions for Von Letkemann and all her other recruits.  Grow also knew that Lay was paying her recruits like Von Letkemann,  but he kept paying her commissions anyway.

Grow didn't meet with Von Letkemann because, as the pharaoh on top of the pyramid, he "typically did not talk to patients."  But Grow's role was to work with the representatives—like Lay—and address "any questions that they had."  With respect to Von Letkemann, Grow did just that by helping Lay with her survey, acting as her liaison with Patient Care, and paying her a hefty chunk of change.  Without these affirmative acts, Lay could not have recruited Von Letkemann and used him to commit healthcare fraud.

Finally, there was sufficient evidence for the jury to find that Grow intended to aid in the commission of the fraud.  Grow told his representatives, including Lay, that when filling out their prefilled prescriptions and intake forms they should "always" select "the highest reimbursement from the insurance company" because it would result in "the highest commission."  See Melgen, 967 F.3d at 1263 ("[T]he jury also could have seen pre-prepping as a sign of Melgen's willful choice to treat the vast majority of his patients for ARMD, whether or not it was medically necessary."); Pon, 963 F.3d at 1236–38 (finding "overwhelming" evidence of

33

healthcare fraud, including that "[t]he record also shows that Pon filled out portions of some patients' charts with WMD diagnoses and planned diagnostic tests before he had even seen the patients").  Grow pushed Patient Care to use a more expensive ingredient for its creams because of the "advantageous" reimbursement rate, even though the less-expensive regular ingredient did the same thing and was easier to use than the one Grow sold.  See Ruan, 966 F.3d at 1125–26 ("Prescribing certain drugs when they had a financial self-interest to do so was not the only example of illegal conduct by Ruan and Couch: the government also sought to prove that they ordered unnecessary drug tests for patients solely because they would generate revenue. . . .  In 2013, Ruan began ordering off-site GC-MS testing for every patient because, in his words, off-site testing 'generates revenue,' while in-office urine tests 'pays nothing.'"); Melgen, 967 F.3d at 1255, 1263 (describing evidence of "motive and means for fraudulently billing Medicare for an expensive drug," including: "One recognized anti-VEGF treatment for wet ARMD is a drug called Lucentis. A single vial of Lucentis costs approximately $2,000. Between 2008 and 2013, Melgen's practice collected nearly $57 million from Medicare for administering Lucentis.  By contrast, Melgen only rarely prescribed Avastin, another drug recognized as a treatment for wet ARMD that costs only $50.").  Grow made a large profit from the fraud.  Each 360-gram jar of pain cream Tricare was billed yielded a $5,329.15 profit for Grow and each jar of scar cream resulted in a $15,729.82 profit.

See Machado, 886 F.3d at 1083 ("Evidence that the defendant profited from a fraud may also provide circumstantial evidence of the intent to participate in that fraud.") Grow paid his representatives, including Lay, to pay recruits so the recruits would order the creams and vitamins.  See Gonzalez, 834 F.3d at 1216 ("What's more, we repeat again, Gonzalez was personally involved in paying cash kickbacks behind locked doors to each and every patient who was purportedly treated with a WinRho infusion at St. Jude.  This arrangement practically screams that something amiss was taking place at the clinic.  Gonzalez's lack of formal nursing or medical training would not have affected her ability to recognize the suspicious nature of the activities in which she was engaged.").  And Grow's testimony that he didn't know about the fraud and didn't intend to defraud Tricare were sufficient evidence for the jury to reasonably conclude that he did know and did intend to defraud.  See Mateos, 623 F.3d at 1362 ("Alvarez's own testimony greatly undermines her sufficiency argument.  A defendant who chooses to testify runs the risk that the jury will disbelieve her testimony, and runs the risk that if disbelieved the jury might conclude the opposite of her testimony is true." (quotation marks and alteration omitted)).

*Kickback Convictions*

Grow challenges his kickback convictions because, he says, there was insufficient evidence to show that he "intentionally broke the law."  Although Grow admits that he paid and received the commissions, he argues that "the evidence

35

shows that [he] believed in good faith that the commissions he paid and received were legal."

The evidence was sufficient for a reasonable jury to conclude that Grow knew it was illegal to pay and receive illegal kickbacks. Grow testified that he had read the anti-kickback statute while working with Patient Care. Grow also admitted that, prior to working with Patient Care, he read and signed agreements requiring him to comply with federal healthcare laws, including "prohibitions of kickbacks." Grow even required Lay to sign a contract that prohibited making "payments to any referral sources in order to induce any referrals." Grow admitted that he knew it was illegal to pay a recruit to obtain a drug or pay a doctor to prescribe a drug, and several of Grow's representatives said that he told them the same thing. Although Grow testified that he didn't think his actions were illegal and didn't intend to violate any law, the jury was permitted to infer that he was lying and conclude the opposite was true. See id. ("A defendant who chooses to testify runs the risk that the jury will disbelieve her testimony, and 'runs the risk that if disbelieved the jury might conclude the opposite of [his] testimony is true.'").

*Money Laundering*

Grow argues that the evidence was insufficient to support his conviction for money laundering because "the government did not prove that [he] knew that commissions paid to or received by sales representatives [we]re illegal

36

remuneration." Grow's money laundering argument is the same as his kickback argument. Grow essentially argues that because he didn't know that the kickbacks were illegal, he also didn't know that laundering the money he made from the kickbacks was illegal. We reject this argument for the same reasons we concluded there was sufficient evidence to support his kickback convictions. Because Grow read the anti-kickback statute while he was working with Patient Care, read and signed agreements requiring that he comply with the federal prohibitions on kickbacks, had Lay sign a contract prohibiting her from paying recruits, and told his representatives that it was illegal to pay recruits, the jury could reasonably have concluded that Grow knew it was illegal to pay and receive kickbacks. And because there was sufficient evidence to support the jury's conclusion that Grow knowingly and intentionally paid and received kickbacks for the prescriptions, the evidence was also sufficient to support Grow's conviction for laundering the proceeds of the kickback scheme.

<u>The District Court's Instruction to the Jury During Deliberations</u>

Grow argues that the district court's instruction to the jury on Friday afternoon, during the third day of deliberations, was "coercive and prejudicial." The district court, Grow says, told the jury "on a Friday afternoon . . . that it had another trial starting Monday" and that it "invit[ed] a partial verdict" even though "[t]he jury

had given no sign that it was deadlocked." According to Grow, the court unduly "prod[ded] the jury" and made an "effort to end the case."

"The applicable standard here is whether under the totality of the circumstances the trial judge's instruction to the jury was coercive." Watson v. Alabama, 841 F.2d 1074, 1076 (11th Cir. 1988). "Courts may not evaluate a single jury instruction in isolation, but must view it in light of the overall charge." Id. "An instruction may be impermissibly coercive if it 'give[s] a jury no choice but to return a verdict[]' or if it 'suggest[s] that a particular outcome was either desired or required." United States v. Lee, 586 F.3d 859, 865 (11th Cir. 2009) (citation omitted).

Looking, as we must, at the instructions as a whole, we conclude that the district court's instruction was not coercive. Although the district court mentioned that the jury could reach a partial verdict, it repeatedly told the jury—before, during, and after the challenged instruction—that there was no minimum time limit and that the jury could deliberate as long as it wanted. Right before the jury started deliberating, the district court told the jury there was "no minimum time" and made clear that the jury was "in control of how long [it would] work." The district court's message was consistent, telling the jury the next day that it could "take as long as [it] want[ed]." Even when the district court mentioned the option of a partial verdict on the third day of deliberations, it again emphasized that there was "no minimum

38

time" and that it did not want the jury to think that "anybody, certainly not the judge, [wa]s interfering." The district court also carefully explained to the jury that the purpose of its instruction was to keep it apprised of a "scheduling conflict."

We read the Friday afternoon instruction, together with the district court's other instructions, as the district court's effort to keep the jury updated about the schedule and the availability of the courtroom. As the former Fifth Circuit, reviewing a similar scheduling instruction, explained: "We do not interpret the court's actions as concern for whether the jurors were having difficulty seeking a verdict, but rather as concern for the fact that the jury members were entitled to some guidance since they had not finished their work at the usual adjournment time." See United States v. Blevinal, 607 F.2d 1124, 1127 (5th Cir. 1979) ("The court had initially told the jury that it would sit each day until five or five-thirty, and the jury was entitled to know by 5:55 p. m. what procedure would be followed as it continued its work. It does not appear that the court intended to do any more.").

Critically, the district court's scheduling instruction did not have a coercive impact on the jury's deliberations. After the Friday afternoon instruction, the jury kept deliberating the rest of Friday and returned to continue its deliberations on Monday. See United States v. Norton, 867 F.2d 1354, 1366 (11th Cir. 1989) ("The jury deliberated some four hours after the trial court's supplementary instruction, a time period not suggestive of a coercive or pressure-filled atmosphere."); United

39

States v. Alonso, 740 F.2d 862, 878 (11th Cir. 1984) (finding no evidence of "coercive impact" where "[t]he earliest verdicts after the court gave the challenged charge were reached five days later"). The jury kept deliberating Monday morning and into Monday afternoon. When it reached its verdict, the jury did not return a partial verdict—it addressed all forty-one questions on the verdict form, acquitting Grow of some charges and convicting him of others. With this record, Grow has not met his burden to show that the district court's instruction impermissibly coerced the jury to cut off its deliberations or to return a partial verdict.

### District Court's Failure to Instruct on Wire Fraud

Grow argues that his conviction for conspiracy to commit healthcare fraud and wire fraud is invalid because the district court failed to instruct the jury on the elements of wire fraud—one of the dual objects charged in the indictment. Although Grow did not object to the district court's failure to instruct at trial, he argues that he is entitled to relief under plain error review.

We do not reach the merits of Grow's argument because he invited the error. "[W]hen a party agrees with a court's proposed instructions, the doctrine of invited error applies, meaning that review is waived even if plain error would result." United States v. Frank, 599 F.3d 1221, 1240 (11th Cir. 2010). Here, Grow not only agreed with the court's proposed instructions, but his own proposed instructions also omitted the elements of wire fraud. To the extent the district court erred, it was

because the district court adopted Grow's proposed conspiracy instruction—which did not have the elements of wire fraud—and Grow accepted the instruction during the charge conference. Under these circumstances, we conclude that Grow has waived appellate review of the district court's failure to instruct on wire fraud. See also United States v. Feldman, 931 F.3d 1245, 1260 (11th Cir. 2019) ("Feldman cannot obtain reversal based on a jury instruction that he affirmatively accepted, so we need not consider whether the instruction was erroneous.").

Grow's Sentence for Conspiracy to Commit Healthcare Fraud and Wire Fraud

Grow argues that his sentence on count one—the dual-object conspiracy to commit healthcare fraud and wire fraud—exceeded the statutory maximum allowed by the jury's verdict. We review de novo the lawfulness of Grow's sentence. See United States v. Moriarty, 429 F.3d 1012, 1023 (11th Cir. 2005).

The district court sentenced Grow to twenty years in prison on count one. Although this sentence did not exceed the statutory maximum for conspiracy to commit wire fraud, see 18 U.S.C. § 1343, it exceeded the ten-year statutory maximum for conspiracy to commit healthcare fraud, see id. § 1347(a). Because the jury returned only a general verdict on count one, and the jury was instructed that it could return a guilty verdict if it found that Grow committed either or both objects of the conspiracy beyond a reasonable doubt, we don't know whether the jury found

41

Grow guilty of conspiracy to commit healthcare fraud, conspiracy to commit wire fraud, or both.

We faced a similar issue in United States v. Allen, 302 F.3d 1260 (11th Cir. 2002). There, the defendants were charged with a conspiracy to distribute cocaine and marijuana, the jury returned a general verdict of guilt on that count, and the statutory maximum sentence for each substance differed. Id. at 1267–78. We found persuasive the Fourth and Sixth Circuits' holdings that, "in the absence of a special verdict," a district court may not sentence a defendant "beyond the maximum sentence for the least serious" substance charged in a multi-object drug conspiracy. See id. at 1270, 1275 (citing United States v. Rhynes, 196 F.3d 207 (4th Cir. 1999) and United States v. Dale, 178 F.3d 429 (6th Cir. 1999)). We rejected the government's argument that because the jury was told it had to find that the defendants conspired to distribute both substances there was no sentencing error. See id. at 1270–75. We explained that "[a]t no time was the jury [so] advised, either in the court's instructions or in the Government's argument to the jury." Id. at 1275. Because the defendants had been sentenced above the statutory maximum for marijuana (the lower of the two), we vacated their sentences for the conspiracy count. Id. at 1268, 1275. We remanded to the district court with instructions that the government "be granted the opportunity, in a timely fashion, to consent to a re-sentencing" on the conspiracy count based on the statutory maximum for marijuana

42

"or to elect to proceed against one or more of the Defendants with a new trial on [the conspiracy count] with a special verdict." Id. at 1275.

The same outcome is required here. The jury was never told it had to find both objects of the conspiracy charged in count one. In fact, it was told the opposite: "The Government does not have to prove that a Defendant willfully conspired to commit all the crimes charged in each conspiracy. It is sufficient if the Government proves beyond a reasonable doubt that a Defendant willfully conspired to commit one of the objects previously discussed and crimes alleged in each conspiracy." Like Allen, we vacate Grow's sentence for count one. See id. (""[W]e find that the Dale-Rhynes violation requires that the sentences of the six defendants as to Count 1 be vacated."); see also Rhynes, 196 F.3d at 239–40, 243 ("For the reasons stated, we affirm appellants' convictions and sentences, except that we withhold judgment on the convictions of W. Rhynes, A. Adams, and T. Adams on Count I."). On remand, the district court must permit the government to either consent to resentencing based on a maximum sentence of ten years on count one or elect to retry Grow on count one with a special verdict. The government must make its decision within thirty days of the issuance of the mandate. See Allen, 302 F.3d at 1280.

## CONCLUSION

The evidence was sufficient to support Grow's convictions, the district court's charge was not coercive or prejudicial, and Grow invited any error in the district

43

court's failure to instruct on the elements of wire fraud.  We therefore affirm Grow's convictions.  However, because the district court's sentence for count one exceeded the statutory maximum allowed by the jury's general verdict, we vacate Grow's twenty-year sentence for count one and remand for proceedings consistent with this opinion.

**CONVICTION AFFIRMED, SENTENCE FOR COUNT ONE VACATED, and REMANDED with instructions.**